**NATIONAL AMERICAN CORP.,**
**Appellant,**

v.

**FEDERAL REPUBLIC OF NIGERIA and Central Bank of Nigeria, Appellees.**

**No. 43, Docket 78-7160.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 13, 1978.

Decided March 30, 1979.

Norman Roy Grutman, Eaton, Van Winkle, Greenspoon & Grutman, New York City (Jewel H. Bjork and Jeffrey H. Daichman, New York City, of counsel), for appellant.

James G. Simms, Kissam, Halpin & Genovese, New York City (Leo T. Kissam and Laurence May, New York City, of counsel), for appellees.

Berthold H. Hoeniger, Bailey, Marshall, Hoeniger & Freitag, New York City, for amicus curiae Reale International, Inc.

Before OAKES and VAN GRAAFEILAND, Circuit Judges, and MISHLEΓ, District Judge.*

* Chief Judge of the United States District Court for the Eastern District of New York, sitting by designation.

OAKES, Circuit Judge:

This contract action founded upon our diversity jurisdiction is one of the many law suits resulting from the almost incredible massive cement purchase program that appellee Federal Republic of Nigeria (Nigeria) mounted in the spring of 1975. Under this program, Nigeria contracted with sixty-eight international suppliers of which appellant, National American Corp. (NAC), is one, for the total purchase of over twenty million metric tons of cement to be unloaded within one year at the port of Lagos, a port capable of unloading only one million metric tons per year. To add lime to the mix, the contracts—if the one involved here is a typical example—involved a built-in bonanza for the suppliers: demurrage claims were payable at per diem per vessel rates with no restriction on the number of suppliers that might use and claim demurrage on a single vessel and with no minimum tonnage required for each vessel. As a result, when the inevitable port congestion delayed unloading, huge demurrage claims began piling up because numerous small ships carrying small tonnages for different suppliers waited in the harbor or outside the port, or, in the case of ships carrying cement sold under CIF (cost, insurance and freight) contracts,[1] simply rested at their home port somewhere in the world. Faced with a national economic disaster because the growing congestion in its only major port threatened the supply of vital consumer goods, Nigeria in August 1975 placed an embargo on all shipping into Lagos. Nigeria notified its suppliers that it would permit no vessels to enter the port except for those already under sail or those giving two months' advance notice of sailing and obtaining permission for departure. Moreover, Nigeria formed a negotiating committee to renegotiate the cement contracts and accompanying letters of credit. It is specifically NAC's contracts as renegotiated that are here in dispute. The United States District Court for the Southern District of New York, Gerard F. Goettel, Judge, held that these renegotiation con-

tracts were valid; that they were not executory accords; that they bound the appellant, NAC; and that under the contracts, appellee had fully paid appellant. *National American Corp. v. Federal Republic of Nigeria,* 448 F.Supp. 622 (S.D.N.Y.1978). Appellant principally argues that the negotiated contracts were ineffective because there was no meeting of the minds, that if effective the renegotiated contracts were not novations but were executory accords, and that in any event NAC is entitled to additional payment because the court below erred in computing its damages. Appellees, in addition to arguing that Judge Goettel's rulings were correct, argue that NAC's original claims arise out of governmental and sovereign acts of Nigeria which are acts of state, thereby rendering the claims nonjusticiable. We affirm for the reasons set out below.

### FACTS

Assuming that the reader may obtain a certain familiarity with Judge Goettel's opinion below, we review the facts only in sufficient detail to elucidate the legal issues on appeal.

As stated, Nigeria's 1975 cement purchase program involved NAC, an American company with Spanish connections. On April 3, 1975, Nigeria entered into a contract with NAC for the purchase of 240,000 tons of Portland Cement at $60 per metric ton CIF Lagos, for a total purchase price of $14,400,000. The contract provided for demurrage payable by the consignee Nigeria at a rate not exceeding $3,500 per diem. The contract was to be governed by the laws of "New York City" and involved issuance through the state bank, appellee Central Bank of Nigeria (CBN), of an irrevocable letter of credit to its correspondent bank, Morgan Guaranty Trust Co. of New York (Morgan). CBN established in favor of NAC a letter of credit with a May 31, 1976, expiration date for $14,400,000, the full amount of the purchase price of the

---

1. CIF contracts generally call for payment on loading against tender of bills of lading cover-

ing transportation. N.Y. U.C.C. § 2–320 (McKinney).

cement, and subsequently agreed to pay for demurrage expenses in excess of the credit amount. NAC assigned portions of the payments due to it under the contract to various corporations, principally two assignments totaling $11,640,000 to International Trade and Finance Espanola, S.A. (Intrafinsa), headed by one Agustine Arrau. Subsequently, after the renegotiation contracts, hereinafter called the agreements of discharge, Intrafinsa reassigned its rights in the letter of credit to NAC with NAC agreeing to pay the shipowner's claims for demurrage when NAC recovered damages.[2]

Performance of the cement contract started in late July 1975 with the shipment of 500 tons of cement upon the vessel Cretan Life (which also carried 10,500 tons consigned by another one of Nigeria's numerous cement suppliers). Five additional vessels, including the Naimbana, Rio Doro, Cherryfield, Joboy, and Jotina, carried cement to Lagos for NAC. These were the "first six vessels"; and by September 10, 1975, Nigeria had completed payment of $2,257,800 for their combined cargoes of 37,630 tons. Six other ships, the Aristotle, Astrid, Ardenal, Sandrina, Euna, and Nicholaos H. (the "second six vessels"), were prepared for loading or were partially loaded when Nigeria imposed its embargo. At the time of the embargo CBN also instructed its correspondent Morgan to dishonor all demurrage claims, even those accruing on vessels that entered the harbor prior to the embargo, unless CBN had certified the documents for payment. Nigeria formalized

this policy in a government decree issued December 19, 1975.[3]

Of NAC's first six vessels, four were eventually unloaded in Lagos; but the Joboy and the Jotina departed without discharging their cargoes. Their owners exercised shipholder's liens and seized the cement. Nigeria would not grant the ships priority berthing, and demurrage was running without payment.[4] As to the second six vessels, although there was deposition testimony from Intrafinsa's Arrau that some of them were half loaded and in the process of being loaded when Nigeria imposed the embargo and that the shipowners sold to Saudi Arabia some of the cement under lien, his records were sufficiently inadequate that the court below found that neither NAC nor Intrafinsa had established any losses. 448 F.Supp. at 628.

In early January 1976, the Nigerian cement contracts negotiating committee invited NAC's president, Dr. Ilona Gero, to renegotiate the cement contract and letter of credit. Gero and Arrau prepared a document dated January 28, 1976, which was introduced in evidence as Exhibit 38, that set Intrafinsa's damages at $3,945,000; the amount allegedly represented the demurrage due on all twelve vessels calculated at $3,500 per day. Also in the document, NAC promised to "cause" Nigeria to accept delivery of an additional 28,370 tons of cement. Calculations supporting the demurrage claim appear as a schedule to the document, but the district court noted that this document mysteriously contains a column listing the "ETA" (estimated time of arrival) La-

**2.** Intrafinsa had authorized Morgan to pay the proceeds of the letter of credit for demurrage on one vessel, the Cherryfield, to Ince & Co., the shipowner, before the April 9, 1976, reassignment from Intrafinsa to NAC. The authorization to Morgan, as well as Morgan's letter of notification to Ince & Co., contained language specifying that the assignment was not an assignment of part of the letter of credit itself, see J. White and R. Summers, *Handbook of the Law Under the Uniform Commercial Code* 636–38 (1972), nor of any actionable right to the Cherryfield demurrage. Nigeria never paid the demurrage, and Ince & Co. never asserted any right to collect under the assignment. The effect of Intrafinsa's later assignment to NAC and the expiration of the letter of

credit on the assignment to Ince & Co. is discussed although in light of our decision on alternative grounds not resolved at note 17 *infra*.

**3.** The trial judge in his opinion states that the decree was issued December 15, 1975, *National Am. Corp. v. Federal Republic of Nigeria*, 448 F.Supp. 622, 629 (S.D.N.Y.1978), but the copy of the decree in the record on appeal is dated December 19, 1975. *See* Defendant's Exhibit FFFF in the Appendix on Appeal.

**4.** As to the ship's lien against cargo for unpaid freight or demurrage, *see* G. Gilmore & C. Black, *The Law of Admiralty* 631 (2d ed. 1975).

gos date for the first six vessels which had already arrived and an "ETA" date for the second six vessels which had never sailed. 448 F.Supp. at 629 n.8. Appellant also introduced in evidence as Exhibits 38B and 71 two other schedules with a similar format. Exhibit 38B calculated demurrage at a pro rata rate of thirty-five cents per ton per day; thus calculations under this schedule would effect a savings to Nigeria if the cargo amount was less than 10,000 tons, as most of the cargoes here involved were. This pro rata calculation yielded demurrage due of $2,784,140, but this particular exhibit also included a claim for $1,992,000 for "cargo not paid for" as of February 7, 1976 (33,200 tons at $60 a ton).[5] Exhibit 71, of which Exhibit 38B is apparently a carbon copy, gives a "TA" or time of arrival for the first six vessels, which are described as "vessels accepted by . . . Nigeria[ ]." The exhibit describes the second six vessels as "awaiting delivery of which cargo and demurrage still unpaid"; and in a column the entries of which should have indicated the date of the bill of lading (according to the format for the schedule of the first six vessels), the date is designated by a handwritten heading as "TA Lagos."[6] As the district judge pointed out, these schedules had an "Alice in Wonderland" character because it is impossible to calculate demurrage at Lagos on vessels that never sailed from their home ports. 448 F.Supp. at 630.

At the New York meeting late in January 1976, Gero and Arrau called in another holder of a Nigerian cement contract, Doris Delia, to act as their agent in the cement committee negotiations. Arrau promptly executed a written power of attorney authorizing Delia to negotiate terms paralleling the claims incorporated in Exhibit 38. Delia returned from Nigeria in the first week of February with two form agree-

ments entitled "agreements of discharge," one with the Federal Ministry of Defense concerning the cement contract and one with CBN concerning the letter of credit. These documents provided for payment for 70,830 tons of cement, represented as "either [having] been delivered . . . or . . . at present awaiting delivery in vessels lying within Nigerian territorial waters." The parties acknowledge in the discharge agreements that the port congestion rendered impossible further deliveries of cement. Finally, each of the parties released the others from all liability on the remaining 169,170 tons of cement and NAC and Intrafinsa agreed to indemnify the Nigerian entities against all third-party claims. Two payment provisos are attached to each of the agreements after the "in witness whereof" clause but preceding the signatures of the parties. One is to the effect that CBN would pay within thirty days of the execution of the agreement for "the full value of the cement already delivered as reflected in the bills of lading and commercial invoices already in the possession of the Morgan Guaranty Trust Co. in New York." The other is that Nigeria would make payment for demurrage within fourteen days of the presentation of the requisite documentation to the Nigerian Ports Authority. Following the execution of these agreements of discharge on February 6, 1976, NAC by letter dated February 16, 1976, requested CBN to instruct Morgan Guaranty to release the funds for the 33,200 tons of cement that the second six vessels were to have carried.

Significantly, by a certification dated February 17, 1976, the cement contracts negotiating committee certified to appellant that it had concluded negotiations with NAC and Intrafinsa, having reached agreements that provided for a cancellation,

---

**5.** The district court noted that the lower demurrage claimed under Exhibit 38B was, give or take a few hundred thousand, offset by the payment of the cargo claim. *See* notes 15-18 and accompanying text *infra*.

**6.** Exhibit 38 included one column of dates headed "B/L [for bill of lading] Date" and one column of dates headed "ETA Lagos." On Ex-

hibit 38B the "TA Lagos" column for the second six vessels is blank, but under "B/L Date" it lists instead the dates given in Exhibit 38 for "ETA Lagos." Exhibit 71 is the s..me as Exhibit 38B except that for the second six vessels the column of dates under "B/L Date" is headed by the additional handwritten notation "TA Lagos."

without payment of compensation and with indemnities, of the balance of 169,170 metric tons of cement under the original contract; an invitation to NAC to negotiate for future cement supply; payment of all existing demurrage obligations, upon the presentation of satisfactory documents, "on the basis of pro rata construction of all demurrage clauses"; [7] and Nigeria's acceptance as existing cargo and demurrage obligations of the charges for the vessels listed on an attached schedule as "at present awaiting discharge of cargo," the schedule naming all twelve vessels with "time arrived" as the times were set forth in plaintiff's Exhibit 71.

As the district court said, "[t]hus, the inference is almost inescapable, and is supported by the testimony of a member of the Cement Committee, that Delia presented Exhibit 71 to the Nigerians in support of the NAC–Intrafinsa claim." 448 F.Supp. at 631. One is left with the further inference, which the district court implied but did not spell out explicitly, that Delia's showing Exhibit 71 to the cement negotiating committee led the committee to assume that

the vessels referred to as "awaiting delivery of which cargo and demurrage still unpaid" had actually arrived in Lagos as of the dates that were under a column headed at the top of the page "Bill of Lading Date" but that bore the handwritten notation "TA Lagos." With this inference, as the judge previously stated, it is apparent that because the vessels had never sailed, "false demurrage claims were submitted to the Nigerians." [8] The supporting documentation may have smacked to the district judge as from Alice in Wonderland; the cement negotiating committee, his findings suggest, were so many oysters which the Walrus and the Carpenter devoured.

On March 12 Morgan paid appellant $1,992,000 for the cargo of the second six vessels bringing the total that the Nigerians had paid to $4,249,800 for twelve shiploads of cement. Nigeria ultimately obtained the cement cargoes of only four ships, however, and thus paid $2,778,000 for cement never received.

In accordance with the discharge agreements, NAC presented to the Nigerian Ports Authority twelve sets of documents,

7. The significance of the "pro rata construction" is that the parties would calculate demurrage based on tonnage rather than a flat amount per vessel.

8. The trial judge noted the metamorphosis of the ETA and TA Lagos columns on the various ship schedules, *see* note 6 *supra*, and commented, "[i]n this manner, the stage appears to have been set for a request for payment for demurrage on the second six vessels." 448 F.Supp. at 630. Later, in discussing the import of Exhibits 38, 38B, and 71, the trial judge commented:

The 70,830 ton figure [in the discharge agreements] derives from the cargoes purportedly aboard plaintiff's twelve vessels, as reflected on the previously discussed Exhibits 38B and 71. To reiterate, of the first six vessels only one had been unloaded and only three remained in Lagos by this time; the last six had never sailed. (The cement aboard the first six vessels had been fully paid for the previous September.) Gero testified that when she and Arrau signed the agreement, this tonnage figure had not been filled in, although the provisos stating the payment terms for cement and demurrage, which were not part of the form agreements used by the Cement Committee, were part of the Agreements of Discharge when she first saw them

in London. *Had the inclusion of this tonnage figure been the only link with the misleading schedules, it would be more difficult to conclude that false demurrage claims were submitted to the Nigerians by Delia with the cooperation of either Arrau or Gero.* However, there also exists a certification of the settlement agreements prepared by the Cement Committee, dated February 17, 1976, which Gero claims Delia delivered to her along with the executed Agreements of Discharge in mid-March. This document confirms that a settlement has been reached, states that NAC would be invited to supply cement if imports were resumed, notes that demurrage clauses will be given *pro rata* construction (*i. e.*, with reference to tonnage) and incorporates the list of twelve vessels, their cargo amounts and, as to the second six vessels, the fictional dates of arrival, as they appear on Exhibit 71. *Thus, the inference is almost inescapable, and is supported by the testimony of a member of the Cement Committee, that Delia presented Exhibit 71 to the Nigerians in support of the NAC–Intrafinsa claim.*

448 F.Supp. at 631 (emphasis added) (footnote omitted).

each corresponding to one vessel, in support of demurrage claims at the "pro rata rate," *i. e.*, at thirty-five cents per ton per day, without regard to the $3,500 per diem rate originally specified. The documents submitted for the first six vessels bore the stamp of the ship's master and included time sheets for several weeks in November, although no time sheets were submitted for the period from the end of November to February 7, 1976 (the day following the discharge agreements). The documents for the second six vessels lacked not only detailed time sheets but also the stamp of the ship's master and the date of the acceptance of the notice of readiness, which as Judge Goettel remarked wryly "is understandable, since they never got to Nigeria." 448 F.Supp. at 632. Intrafinsa and one of its subsidiaries nevertheless certified these documents as correct. Originally Nigeria was ready to authorize payment of some $2,337,-713 for demurrage; but when it became aware that some of the vessels covered by the various settlement agreements were not in Nigerian waters it suspended all demurrage payments to the suppliers involved, including NAC. NAC, in response to a cable demanding an explanation for the missing ships, filed this suit attaching funds of the appellees in New York.

## DISCUSSION

In the pretrial order, appellant claimed damages of $11,471,114.42 on the theory that the agreements of discharge were ineffective. 448 F.Supp. at 646–47. The amount included demurrage at the flat per diem rate on the first six vessels, lost profits on the undelivered cement, unoccasioned demurrage for the vessels that would have been necessary to transport it, charter expenses, and incidental expenses. At trial, however, there was a total failure of proof of the expense items, due as the trial court put it, "to the allegedly unexpected unavailability of Arrau which was, in all likelihood, deliberate on his part." 448 F.Supp. at 647.

As to the lost profits, the court below found that the agreements of discharge superseded the earlier anticipation of profits. Before considering the trial court's calculation of damages under the agreements of discharge, we must determine whether the agreements did supersede the original contract.

## I. SUBSTITUTE CONTRACTS

NAC argues that the agreements of discharge were ineffective because there was no meeting of the minds, NAC and Intrafinsa signed under duress, Delia exceeded her authority in accepting the terms of the agreements, and the agreements were mere executory accords. Presumably from these arguments it would follow that NAC would be entitled to damages under the original contract, although we do not know what these would be in light of the total failure of proof aforesaid and our lack of knowledge of the evidence as to "lost profits." [9]

■ Appellant's first argument is that the agreements of discharge were ineffective because there was no "meeting of the minds." Appellant argues both that the agreements were "riddled with ambiguities and inaccuracies" as well as with omissions of material elements and that the trial judge reformed the tonnage to a figure contrary to that which NAC intended when it made the agreement. Some of the "ambiguities," "inaccuracies," and "omissions" that appellant decries arise from the inclusion in the appellant's copies of the form contracts of an additional page containing two payment provisos relating to payment for cement as to which Morgan already possessed the bills of lading and payment for demurrage on the basis of documents to be submitted. Appellant also points out that one of the discharge agreements omits the key phrase in which appellees agreed to accept only vessels in Nigerian waters. And appellant argues that the discharge

9. Appellant sets forth various calculations of damages in its brief—$7,882,955 (allegedly as of January 20, 1976), at 14; $7,926,955 (with additional demurrage but less payment for car-

go on second six vessels), at 14 n. *. Appellant sets the amount of lost profits at $1,945,555. Suit was for $14,400,000.

agreements are silent as to whether demurrage was to be calculated per diem or pro rata.

None of these arguments is convincing. The parties prepared the agreements of discharge according to the form that the negotiating committee used in its settlements with other cement suppliers. Appellant's copies of the agreements contained the provisos that the district court construed in determining the terms of the discharge agreements with respect to the payment for cement and demurrage; any omission from appellees' copies would be important only if they sought to avoid the terms of the provisos, which they do not. The omission in one of the discharge agreements forms of the words "awaiting delivery in vessels lying within Nigerian territorial waters" is obviously a typographical error, the printer or typist of the form having skipped an entire line. Appellant, moreover, had full notice from the other discharge agreement of the contents of the line so omitted.

Although the discharge agreements are silent on the question of the method of calculation of demurrage, it is very clear, and the district court so found, that the negotiating committee was acting on the basis that per diem rates of demurrage as contained in the original contract were a major source of irritation between Nigeria and the suppliers, 448 F.Supp. at 629, because such provisions permitted unlimited demurrage regardless of the tonnage shipped or the number of suppliers shipping on a single vessel. In any event, the "certificates" of the negotiating committee dated February 17 spoke of a pro rata calculation even though they did not refer specifically to thirty-five cents a ton as the rate; this reference is clearly different from the per diem figure. More important, plaintiff's Exhibits 38B and 71, at least one of which the district court found was shown to and acted upon by the negotiating committee, calculated demurrage on the basis of the pro rata rate of thirty-five cents per ton per day; and the documents that appellant actually submitted to the Nigerian Ports Authority in support of the demurrage claims *sought* payment at the pro rata rate.

448 F.Supp. at 631 & n. 13. We also find that the further discrepancies or inconsistencies in the agreements of discharge that appellant cites are immaterial.

■ Appellant also objects to the trial court's reformation of the tonnage figure in the discharge agreements, contending that there was no meeting of the minds on the amount as reformed. The discharge agreements do specifically refer to 70,830 metric tons of cement, covering the tonnage shipped on the first six vessels as well as the tonnage to have been shipped on the second six. The district court, however, read as controlling, as we do, the provision in the discharge agreements that referred to the tonnage as either actually "delivered under the said Letter of Credit or . . . at present awaiting delivery in vessels lying within Nigerian territorial waters." Appellant argues that the word "delivered" meant delivered under the terms of the original CIF cement contract, that is, that it referred to the second six vessels which had been in the loading process or were prepared to load when Nigeria imposed the embargo. Appellant argues that because this was neither a case of mistake and fraud nor a case of mutual mistake, the court below improperly reformed the contracts by reading the word "delivery" to mean "discharged." Appellant states that "delivery" under the letter of credit means simply "delivered to the second six vessels CIF," that is, ready to ship.

■ It is true under a CIF contract that the seller fulfills his obligation simply by loading the cargo and forwarding to the buyer a bill of lading and insurance certificate. *Thames & Mersey Marine Insurance Co. v. United States,* 237 U.S. 19, 26, 35 S.Ct. 496, 59 L.Ed. 821 (1915); *Seaver v. Lindsay Light Co.,* 233 N.Y. 273, 276, 135 N.E. 329, 330 (1922); *see* note 1 *supra.* And here appellant had delivered to the correspondent bank, Morgan Guaranty, the documentation that the original contract required for payment for the cement on the second six vessels. But the plain language of both of the agreements of discharge re-

fers to "delivery," meaning "physical delivery" of the cement to Nigeria rather than "delivery on CIF terms" to the ships for loading. There is nothing whatsoever about CIF terms in the agreements of discharge. If as appellant suggests a CIF provision were implied in the agreements of discharge or incorporated by the reference to the letter of credit, the language as to the delivery of tonnage by the "vessels lying within Nigerian territorial waters" would be totally superfluous: if "delivered" when loaded, this cargo would already be delivered and not "awaiting delivery." The trial judge's interpretation of the discharge agreement is thus, we think, correct.

Moreover, it is curious that appellant now urges this interpretation of the word "delivery" because Judge Goettel noted that NAC "has recognized that the payment for undelivered cement in March, 1976 must be offset from any recovery for demurrage." 448 F.Supp. at 647. This accurately follows counsel's position at Arrau's deposition that the $1,992,000 was a payment for past due demurrage rather than for cement,[10] and it parallels NAC's answer to defendant's Interrogatory No. 31. In light of these concessions, it is apparent that appellant is attempting to change its position on appeal; under the position that appellant now urges, there would have been no undelivered cement.

■ The court below correctly reformed the agreements of discharge with regard to the tonnage figure on the grounds of either mutual mistake or fraud. It was the cement in the harbor which the parties intended to be covered. By either mutual mistake or by fraud the agreements of discharge erroneously indicated that twelve ships were there making the tonnage figure greater than it was in fact. Certainly there was mistake on the part of the negotiating committee, which, because of the confusion in the harbor and Nigeria's total lack of capacity to handle the situation, did not find out until after it executed the agreements of discharge that the second six vessels had never arrived. If the court below believed appellant's witness Gero, NAC's president, in her statement that she also did not learn until May 1976 that the second six vessels had never sailed to Lagos, the court could have found a mutual mistake of fact leading up to the negotiation of the agreements of discharge, warranting reformation under well-established principles of law. *See* Restatement (Second) of Contracts §§ 294, 297 (Tent.Draft No. 10, 1975).[11]

If the court did not believe Gero, of if Arrau knew that the second six ships had not sailed, then the court could readily find that NAC had committed fraud against the negotiating committee. As noted in the discussion of the facts, *supra*, the inference is almost inescapable that appellant's agent Delia presented Exhibit 71, the obviously doctored version of the schedule in Exhibit 38B, in an attempt to mislead Nigeria as to the location of the second six vessels; certainly Exhibit 71, the settlement claim, misstates the facts as to the second six vessels. And in executing the agreements the negotiating committee quite clearly relied on the representations because as previously pointed out its certification of February 17 refers to the second six vessels as "at present awaiting discharge of cargo" and notes their "time arrived." A finding of fraud on the part of NAC and resulting mistake on the part of Nigeria would also warrant reformation of the agreements of discharge to reflect the lower tonnage figure, that is, only the cargo on the six vessels actually in the harbor. *See In re Wesche's Will*, 4 A.D.2d 997, 169 N.Y.S.2d 612 (1957); Restatement (Second) of Contracts §§ 306, 308 (Tent.Draft No. 11, 1976).

---

10. Deposition of Agustine Arrau, June 6, 1977, at 137–38, Appendix on Appeal 831–32.

11. "Where there has been part performance under a written contract, . . . and the writing is not in accordance with an identical intention of both parties at the time of the contract . . . either party can have judgment for reforming the contract . . . ." *Restatement of Contracts* § 509(2) (1932). "Where circumstances justify reformation of a writing . . . a court may in its discretion without a preliminary decree of reformation give effect to the transaction as if it had been reformed." *Id.* § 507.

Any other rule would permit the defrauding party in a settlement to benefit by his fraud. Analogous is the line of New York authority which permits a party with a claim that he is induced to settle by fraud to recover damages for the fraud without rescission of the settlement. *E.g., Strong v. Strong*, 102 N.Y. 69, 5 N.E. 799 (1886); *Byrnes v. National Union Insurance Co.*, 34 A.D.2d 872, 310 N.Y.S.2d 781 (1970); *Inman v. Merchants Mutual Casualty Co.*, 274 A.D. 320, 83 N.Y.S.2d 801, 804 (1948). *See generally* C. McCormick, *Handbook on the Law of Damages* § 121 (1935). Here, the defrauded party is the obligor, but by equity he should be given the benefit of the expected settlement. As McCormick says, "A willful fraud should cost as much as a broken promise." *Id.* at 453.

Appellant argues that there could have been no reliance on any representation that twelve ships were in Lagos harbor because even with the port congestion appellees "always had control over their own harbor conditions, always had the ability to monitor the arrivals and departure of ships and did in fact take a census of the ships which were there." [12] But the testimony before Judge Goettel showed that at the time Nigeria imposed the embargo and through the spring of 1976 Nigeria was not able to confirm the presence or absence of particular vessels in their territorial waters; as the court found, there was "a demonstrated inability to verify which vessels were in their waters and for how long they had been there." 448 F.Supp. at 645. It was also clear that the negotiating committee did not have the capacity or the responsibility to confirm the location of vessels; that the negotiating committee dealt with the suppliers and their agents in good faith and accepted their representations as to consignments of cement already delivered or aboard vessels in Nigerian waters; and that in fact, in the case of NAC, Nigeria did not

become aware of the missing vessels until after Morgan had made payment for their cargoes.

Appellant also argues that the discharge agreements cannot bind it because they were inconsistent with the authority that it gave to its agent Delia and that the discharge agreements are voidable for economic duress. The long answers to each of those arguments are contained in Judge Goettel's opinion below, 448 F.Supp. at 645 (lack of authority), and *id.* at 644 (duress), and we hereby incorporate by reference these portions of Judge Goettel's opinion. The short answer to the question of authority is that both Gero on behalf of appellant and Arrau on behalf of Intrafinsa executed the agreements of discharge; thereafter Gero received a copy of the certification of the negotiating committee; both NAC and Intrafinsa accepted payments for cement pursuant to the agreements; and both then pressed for payment for demurrage on the twelve vessels. There was thus plainly ratification under *Restatement (Second) of Agency* § 98 and Comment b (1958). The short answer to the question of duress is that on appeal NAC presents nothing that it did not present to Judge Goettel and on which he did not act correctly. In the absence of clear error, we are bound by his finding that NAC "ha[d] not carried its burden in showing that it acted from true business compulsion." 448 F.Supp. at 644.

Appellant makes a substantial claim for damages for breach of the original cement contract on the basis that the discharge agreements were executory accords that Nigeria breached rather than a substitute contract.[13] There is language in the agreements of discharge to support both positions. NAC particularly relies on the addition to the Nigerian forms of the provisos which set time limits for Nigeria's payment for cement and demurrage; appellant

---

12. Brief for Appellant at 34.

13. An accord is "a contract to accept in the future a stated performance in satisfaction of an existing contractual duty." *Restatement of Contracts, supra*, § 417. If the debtor breaks an accord, the creditor can enforce either the

original duty or the duty under the accord. *Id.* § 417(c). NAC contends that the discharge agreements were executory accords and that it is therefore entitled to sue for damages under the original contract.

argues that this language conditions the release on Nigeria's performance and indicates an executory accord. But there is other language in the discharge agreements that is indicative of a substitute contract including an acknowledgment that future performance is impossible and mutual statements of release and discharge.

Judge Goettel, besides considering the language of the agreements, looked at the circumstances surrounding the negotiations as required by *Goldbard v. Empire State Mutual Life Insurance Co.*, 5 A.D.2d 230, 171 N.Y.S.2d 194 (1st Dep't 1958). *See also United Nations Korean Reconstruction Agency v. Glass Production Methods, Inc.*, 291 F.2d 168, 172 (2d Cir. 1961); *Restatement of Contracts* §§ 417–19 (1932); 6 *Corbin on Contracts* § 1269, at 75 (1962). The agreements of discharge resulted from formal proceedings which the parties regarded as such. *See* 448 F.Supp. at 644. Moreover, as the trial court found, the obligation to pay demurrage could not fairly be viewed as liquidated in amount. *Id.; see Restatement of Contracts* § 419. Under all the circumstances we cannot say that the trial judge's conclusion that the parties intended a novation is clearly erroneous under Fed.R.Civ.P. 52(a). *See United Nations Korean Reconstruction Agency, supra.*

Thus we cannot agree with appellant that it is due damages under the original contract. For the reasons stated above we

hold that Judge Goettel was correct in ruling that the discharge agreements were valid, binding agreements superseding the original contract.[14]

## II. DAMAGES

The trial court found that the sum of the demurrage claims for the first six vessels that appellant was able to prove was less than the amount that Nigeria had paid appellant for cement in the second six vessels while under the mistaken impression that the second six vessels were inside its territorial waters. The court accordingly found that appellant was not entitled to recover any damages.[15] Appellant argues, however, that the district court's computation of damages was incorrect because appellant was entitled to full payment for the cement on the second six vessels and because appellant adequately proved various demurrage claims which the court disallowed.

With respect to payment for the cement on the second six vessels, our previous discussion indicates that appellant was not entitled to the $1,992,000 which Nigeria paid. Accordingly, that amount was an overpayment and is available for setoff against demurrage charges.

■ Appellant argues that it was entitled to demurrage on the Joboy and Jotina which arrived in Lagos in September 1975 and sailed off in January 1976 without dis-

---

**14.** Given our resolution of the issue of the validity of the agreements of discharge, we need not consider Nigeria's assertion of the act of state defense in response to NAC's claim under the original contract.

**15.** Nigeria overpaid appellant $1,992,000 for the cement of the second six vessels that it never received. Appellant's claim for demurrage on the first six vessels totaled $2,588,999. Thus appellant's potential damages, should it prove all of its demurrage claims, were $596,-999. The trial judge found that appellant did not prove damages with respect to the demurrage owing on the Cherryfield. 448 F.Supp. at 647. Because the demurrage claimed on the Cherryfield, $903,420, is larger than $596,999, the trial judge found that Nigeria owed no damages to NAC. *Id.* The trial judge found in the alternative that appellant failed to prove damages with respect to the demurrage owing on the Joboy and Jotina. Appellant's claims on

these two vessels totaled $561,925. Subtracting this amount from the potential damages leaves $35,074. The trial judge further found that the vessel Rio Doro may have left the Lagos harbor for a substantial period and thus that appellant failed to prove its claim for a substantial portion of the $988,575 for demurrage owing on the Rio Doro. This "substantial period" is long enough to account for more than $35,074 of the $988,575 claimed, *see* note 18 *infra*; under the trial judge's alternative holding appellant also failed to prove overall damages even if it were to prevail on its claim for the Cherryfield. *Id.* at 647–48. Because we agree with Judge Goettel that the alternative arguments of appellee, involving the Joby, Jotina, and Rio Doro, establish that appellant is not entitled to further recovery, we need not reach the issue of demurrage on the Cherryfield.

charging their cargo. The cement on the two vessels was never delivered, of course, because the shipowners exercised their liens on the cargo for satisfaction of the accumulated demurrage. Judge Goettel, on the basis that appellant had an obligation to mitigate damages and failed to establish how much the shipowners had realized for the cargoes, held that appellant had not proven mitigation of damages because those proceeds, whatever the amount, would have reduced appellant's potential liability to the shipowners for demurrage. This holding is clearly correct.

The trial judge disallowed appellant's claims for demurrage on two other vessels, the Cherryfield and the Rio Doro. The disallowance of either claim, given the overpayment for the cement and the disallowance of demurrage for the Joboy and Jotina, would be enough to leave appellant without proof of overall damage from the breach of the agreements of discharge.[16]

■ Appellees argue, however, and Judge Goettel found, that NAC had no right to demurrage on the vessel Cherryfield because NAC had assigned to Ince & Co. the right to collect the proceeds of the letter of credit resulting from such demurrage. Appellant argues, with considerable cogency, that it never gave Ince & Co. an exclusive interest in the Cherryfield demurrage.[17] We need not decide, however, whether Judge Goettel was correct in disallowing the claim for demurrage for the

Cherryfield, given our resolution, discussed below, of the Rio Doro claim.

Appellee points out that the Rio Doro left Lagos for a substantial period of time and then returned for unloading. NAC disputes its absence, but it was unable to prove the ship's whereabouts because the vessel was apparently scrapped at some point and its documents destroyed. Thus Judge Goettel found that appellant had failed to maintain its burden of proof as to a substantial part of the Rio Doro demurrage claim of $988,-575. We take it that by "substantial part" of the Rio Doro demurrage claim Judge Goettel meant a period greater than ten days out of the 269 for which appellant claimed demurrage; demurrage for only ten days would offset any claim that appellant may have had on any of the alternative theories.[18] On this basis the amount of demurrage owing to NAC, considering the elimination of the Joboy and Jotina claims and the reduction of the Rio Doro claim, is less than Nigeria's overpayment for the cement; and thus NAC has failed to prove any damages.

The judgment is affirmed.

VAN GRAAFEILAND, Circuit Judge, dissenting:

Because my understanding of the law of reformation differs markedly from that of my colleagues, I must dissent.

The opinion of the trial judge does not fully state the legal basis for his finding that Ince & Co. retains the sole right to the Cherryfield demurrage. The findings of fact in the opinion are not sufficiently detailed to enable us to determine the validity of appellant's contrary position. But because we resolve the issue of damages on alternative grounds, we refrain from deciding the question of the Cherryfield demurrage.

---

16. *See* note 15 *supra.*

17. Appellant contends that the assignment of proceeds from Intrafinsa to Ince & Co. was merely an authorization allowing Ince & Co. to collect the money directly from Morgan. Appellant denies that the assignment rearranged the existing legal rights of the parties. The language of Intrafinsa's instruction to Morgan and Morgan's modification of the assignment to Ince & Co. supports appellant's claims. Both documents explicitly disclaim that they operate to give Ince & Co. any actionable right to the Cherryfield demurrage. If Ince & Co. had accepted the assignment as satisfaction of Intrafinsa's obligations to pay Ince & Co. charter hire, the intent of the parties to effect a binding assignment would be clear; but we are aware of no evidence of such an agreement in the record.

18. The disallowance of 10 days of the demurrage claim on the Rio Doro, which carried 10,-500 tons of cement, at $.35 demurrage per ton per day, amounts to a disallowance of $36,750. Because this amount is greater than the $35,-074 potential damages, given the disallowance of claims on the Joboy and Jotina the disallowance of 10 days' demurrage is sufficient to eliminate any further recovery.

Although the facts are somewhat complicated, they resolve themselves into a simple legal issue. The parties entered into written settlement agreements providing for payment of demurrage and cargo on twelve ships. The defendants believed that all twelve had reached Nigerian waters when in fact six of them had never sailed. Defendants' mistaken belief was either induced or shared by the plaintiff. Under such circumstances, can the written agreements be reformed by reducing defendants' obligation thereunder to the payment of cargo and demurrage on only six ships while at the same time plaintiff is held fully bound to release its claims involving all twelve?

Judge Oakes states that the district court "could have found a mutual mistake of fact *leading up to the negotiation of the agreements* of discharge, warranting reformation under well-established principles of law." Majority op., *ante* at 322 (emphasis supplied). Alternatively, he says fraud or misrepresentation as to the location of the second six ships and resulting mistake on the part of the Nigerians would also warrant reformation. I respectfully suggest that this is not the established law of reformation in New York or in any other American jurisdiction.

"Reformation is an ancient remedy used to reframe written contracts to reflect accurately the real agreement between contracting parties when, either through mutual mistake or unilateral mistake coupled with actual or equitable fraud by the other party, the writing does not embody the contract as actually made." *Mutual of Omaha Insurance Co. v. Russell,* 402 F.2d 339, 344 (10th Cir. 1968), *cert. denied,* 394 U.S. 973, 89 S.Ct. 1456, 22 L.Ed.2d 753 (1969).

Reformation may be used only to make an instrument conform to the actual agreement between the parties. *Beecher v. Able,* 575 F.2d 1010, 1015 (2d Cir. 1978); *Brubrad Co. v. United States Postal Service,* 404 F.Supp. 691, 693 (E.D.N.Y.1975), *aff'd,* 538 F.2d 308 (2d Cir.), *cert. denied,* 429 U.S. 834, 97 S.Ct. 99, 50 L.Ed.2d 99 (1976). 3 *Corbin*

*on Contracts* § 614 (1960). In reforming an instrument, the court does not make a new agreement; it merely declares what the actual agreement was. *Schongalla v. Hickey,* 149 F.2d 687, 690 (2d Cir.), *cert. denied,* 326 U.S. 736, 66 S.Ct. 46, 90 L.Ed. 439 (1945); *Agee v. Travelers Indemnity Co.,* 264 F.Supp. 322, 326 (W.D.Okla.1967), *aff'd,* 396 F.2d 57 (10th Cir. 1968); 66 Am.Jur.2d *Reformation of Instruments* § 5 at 530; *City of New York v. Pennsylvania R.R.,* 281 App.Div. 27, 31, 117 N.Y.S.2d 140 (1952), *aff'd,* 305 N.Y. 788, 113 N.E.2d 301 (1953). "It is not what the parties would have intended if they had known better, but what did they intend at the time, informed as they were." *Beecher v. Able, supra,* 575 F.2d at 1015 (quoting *Russell v. Shell Petroleum Corp.,* 66 F.2d 864, 867 (10th Cir. 1933)).

Once this intention is incorporated in the parties' written agreement, the agreement cannot thereafter be reformed on the ground that one party was induced by fraud to agree. *Long v. Sergio,* 36 Misc.2d 668, 670, 233 N.Y.S.2d 715 (1962), *aff'd,* 19 A.D.2d 588, 240 N.Y.S.2d 152 (1963); *Simons v. Crowley,* 112 N.Y.S.2d 851, 855–56 (Sup.Ct.1952); *Charles Albert Co. v. Newtown Creek Realty Corp.,* 211 App.Div. 1, 3–4, 206 N.Y.S. 670 (1924); *Russell v. Shell Petroleum Corp., supra,* 66 F.2d at 868; 12 *Williston on Contracts* § 1525A (2d ed. 1970). If that party agreed because he was deceived, he may demand rescission but not reformation. *Buffalo Electric Co. v. State of New York,* 17 A.D.2d 523, 526, 236 N.Y. S.2d 581 (1963).

The majority cite one New York case and several sections of the Restatement of Contracts as supportive of their interpretation of the law of reformation. My reading of these authorities leads me to a contrary conclusion. Section 297 of Tentative Draft No. 10 of the Second Restatement provides for reformation where a writing embodying an agreement fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing. In Comment "a" under this section, the drafters state that the "province of refor-

mation is to make a writing express the agreement that the parties intended it should" and that "reformation is available when the parties, having reached an agreement and having then attempted to reduce it to writing, fail to express it correctly in the writing."

Section 308 of Tentative Draft No. 11 permits reformation when a party's manifestation of assent is induced by the other party's fraudulent misrepresentation as to the contents or effect of a writing. Comment "b" thereunder states that the section is applicable "only to misrepresentations as to the contents or effect of a writing" and that "[i]f the misrepresentation relates to some other fact, the contract may be voidable under § 306, but reformation is not appropriate." This is the established New York rule.

> Where the writing expresses the agreement, but the agreement was induced by fraud or misrepresentation, the injured party may be entitled to rescission or cancellation. Reformation is not the proper remedy.

1933 New York Annotations to the Restatement of Contracts at 309 (emphasis in original).

In re Wesche, 4 A.D.2d 997, 169 N.Y.S.2d 612 (1957), cited by the majority, is not to the contrary. There the court held that the Allegheny County Surrogate had the equitable power to reform an instrument of release "so as to conform to the prior agreement of the parties." Id. 4 A.D.2d at 998, 169 N.Y.S.2d at 613.[1] That is not what the district judge did in this case.

It is clear beyond dispute that the Agreements of Discharge herein covered and were intended to cover all twelve ships. The record shows that Mrs. Delia went to Nigeria intending to negotiate payment for cargo and demurrage on all twelve ships. She took with her a list containing the names of the twelve, and she presented this list to the Negotiating Committee in support of her principals' claim. A certificate subsequently issued by the Negotiating Committee names the twelve ships[2] and states that they are accepted in accordance with paragraph 3 of the certificate.[3] Defendants' witnesses testified that the Committee's certificate "correctly summarize[s] the agreements that were negotiated . . . ." The total amount of cement on the twelve ships was 70,830 metric tons, the amount which, according to the Agreements of Discharge, had either been delivered under the letter of credit or was then awaiting delivery in vessels lying in Nigerian territorial waters.

The bills of lading and commercial invoices that plaintiff had presented to Morgan Guaranty in November 1975 covered $1,992,000 worth of cement to be transported to Nigeria on ships seven through twelve. On March 11, 1976, Central Bank of Nigeria cabled instructions to Morgan Guaranty to pay the C.I.F. value of the cement on ships seven through twelve, and on March 12, 1976, Morgan Guaranty paid plaintiff $1,992,000.

1. Sections 294 of Tentative Draft No. 10 and 306 of Tentative Draft No. 11 deal with avoidance of contracts. That issue is not before us.

    Likewise inapposite are the cases cited by the majority that permit one, who was fraudulently induced to execute a release, to sue for damages without first rescinding the settlement and restoring the consideration received.

2. The twelve ships and the tonnage of cement that they carried, as shown in the Negotiating Committee's Certificate, are as follows:

| Name | Metric Tons |
| --- | --- |
| 1. Cretan Life | 500 |
| 2. Naimbana | 2,730 |
| 3. Rio Doro | 10,500 |
| 4. Jotina | 5,600 |
| 5. Joboy | 7,500 |
| 6. Cherryfield | 10,800 |
| 7. Aristotle | 8,000 |
| 8. Astrid | 3,200 |
| 9. Ardenal | 5,700 |
| 10. Sandrina | 5,300 |
| 11. Euna | 6,800 |
| 12. Nikolaos H. | 4,200 |
| | 70,830 —(Total tonnage figure supplied) |

3. Paragraph 3 of the Certificate reads as follows: "That subject to the presentation of satisfactory documents all existing cargo and demurrage obligations be met on the basis of pro rata construction of all demurrage clauses."

All of the foregoing facts are conceded by defendants,[4] and it cannot be disputed that the parties intended to include ships seven through twelve and their contents within the terms of their Agreement of Discharge. This being so, the fact, as the district court found, that defendants were misled into believing that ships seven through twelve were in Nigerian waters at the time they executed the Agreements of Discharge, did not justify the district court in reforming the Agreements so as to eliminate these vessels from the instruments' coverage.

Either the contracts covered and included the twelve ships, or there were no contracts. "There must have been a meeting of the minds of the contracting parties concerning the agreement, or agreements, which the court is asked to declare existent." *Metzger v. Aetna Insurance Co.*, 227 N.Y. 411, 417, 125 N.E. 814, 816 (1920). "If no prior agreement or intention existed, then the only remedy is rescission. . . ." 66 Am.Jur.2d, *supra*, at 383–84. The logic of the majority's argument concerning part performance escapes me completely. I fail to see how the defendants' "part performance", which consisted of paying for cement loaded on the second six ships, can serve as the basis for reforming the contracts so as to eliminate completely the requirement for such payment. I am convinced that the district court erred when it designated the $1,992,000 payment for cement on ships seven through twelve as an "overpayment under settlement" while at the same time holding plaintiff bound by its agreement to release all claims involving these same ships.

I am convinced also that it would be a misstatement of the facts to argue that plaintiff did not intend to be paid demurrage for the second six ships. Although the defendants' agreement to make such payments may have been induced by the mistaken belief of one or both of the negotiating parties that the ships were in Nigerian waters, it will not do to pretend that the subject of demurrage was not covered in the written instruments. As defendants concede in their brief, "[t]he Negotiating Committee in good faith accepted the settlement claim and incorporated its terms into the Agreements of Discharge." If the minds of the parties did not thus meet, the appropriate remedy would be to cancel the Agreements. *3 Pomeroy's Equity Jurisprudence* § 870 at 383–84 (5th ed. 1941).

The majority makes sport of the plight of plaintiff and its associates, overlooking the fact that at least one of them, Intrafinsa, is now in the hands of creditors.[5] It is undisputed that Nigeria, imperiously and by threat of force,[6] breached a valid contract to purchase 240,000 tons of cement from plaintiff. Plaintiff is now being deprived of its right to recover damages for that breach by an "Agreement of Discharge", the terms of which were not agreed upon by the parties but were created in the mind of the district judge. I cannot concur in this inequity.

---

**4.** On pages 12–15 of defendants' brief, they state: "The settlement claim identifies the twelve vessels in question; it states that the total tonnage for the twelve vessels was 70,830 metric tons; that the value of the cargo not paid for amounted to $1,992,000; and that total demurrage due as of February 7, 1976 totaled $2,784,140. . . . The Negotiating Committee in good faith accepted the settlement claim and incorporated its terms into the Agreements of Discharge (379–381). . . . On March 2, 1976 Central Bank instructed Morgan Guaranty to make payment with respect to the documentation Morgan Guaranty was holding for Cement Cargos, *i. e.*, that relating to the second six vessels (460). Payment was made by Mor-

gan Guaranty in the sum of $1,992,000 representing 33,200 tons of cement at $60 per ton (1224)."

**5.** In order to carry out the terms of the Nigerian contract, Intrafinsa contracted to buy the cement from Spanish and Portuguese mills and agreed through a shipbroker to charter seventeen ships with which to transport it to Nigeria.

**6.** Plaintiff was informed by telegram on September 22, 1975, that anyone violating Nigeria's embargo "will be liable to have his vessel denied entrance to Nigerian territorial waters by force if necessary X This is a final warning."