**DECOR BY NIKKEI INTERNATIONAL, INC., d/b/a Nikkei International, Inc., Plaintiff,**

v.

**FEDERAL REPUBLIC OF NIGERIA and Central Bank of Nigeria, Defendants.**

**CHENAX MAJESTY, INC., Plaintiff,**

v.

**FEDERAL REPUBLIC OF NIGERIA and Central Bank of Nigeria, Defendants.**

**EAST EUROPE IMPORT–EXPORT, INC., Plaintiff,**

v.

**FEDERAL REPUBLIC OF NIGERIA and Central Bank of Nigeria, Defendants.**

**Nos. 77 Civ. 2348 (LWP), 77 Civ. 3045 (LWP) and 77 Civ. 2809 (LWP).**

United States District Court, S. D. New York.

Aug. 18, 1980.

Lewis S. Sandler, New York City, for plaintiffs Decor by Nikkei International, Inc. and Chenax Majesty, Inc.

Berthold H. Hoeniger, New York City, for plaintiff East Europe Import-Export Inc.

Mitchell M. Bailey, Simone V. Palazzolo, New York City, for plaintiffs.

James G. Simms, Leo T. Kissam, New York City, for defendants.

PIERCE, District Judge.

## OPINION AND ORDER

These are diversity actions for alleged breaches of contract. Plaintiffs are three independent corporate entities. In early 1975, they each separately contracted to provide the Federal Military Government of

the Federal Republic of Nigeria with quantities of bagged cement. They each contend that thereafter in the fall of 1975 their contracts were anticipatorily breached. Each plaintiff seeks to recover the profits it contends it would have earned in the performance of its contract had the alleged breach not occurred. Each plaintiff also seeks to recover its alleged lost profits on the ground that three separate letters of credit issued by defendant Central Bank of Nigeria for their respective individual benefits was unilaterally modified without the consent of the plaintiffs. The letters of credit were issued by Central Bank of Nigeria pursuant to the terms of the contracts in controversy. Finally, plaintiffs seek to recover the profits they contend each would have earned as demurrage payments, and they also seek to obtain incidental damages, punitive damages, and interest.

These claims of the plaintiffs were tried to this Court commencing on September 10, 1979. The following discussion shall constitute the findings of fact and conclusions of law of the Court in this matter.

*FINDINGS OF FACT*

In 1975, the government of Nigeria, through the Nigerian Federal Ministry of Defence, entered into more than 70 contracts with foreign cement suppliers as part of its program to purchase 16 to 18 million metric tons of cement. See Defendants' Proposed Findings of Fact and Conclusions of Law ¶¶ 147, 205. All of the cement purchased by the Nigerian government through these contracts was to be delivered to Nigeria over an eighteen month period during the years 1975 and 1976. Id. ¶¶ 147, 165. Pursuant to these contracts, the Central Bank of Nigeria ("CBN") established individual letters of credit in favor of at least some of the cement suppliers, including the plaintiffs herein. The bank is an agency of the Nigerian government.

In mid–1975, the Nigerian ports became severely congested with ships seeking to discharge their cargos. Threatened with a national economic disaster because of this congestion, the Nigerian government placed an embargo on all shipping into the port of Lagos. *National American Corp. v. Federal Republic of Nigeria*, 597 F.2d 314, 316 (2d Cir. 1979). Thereafter, the national government established a negotiating committee which was responsible for renegotiating the foreign cement contracts and related letters of credit on behalf of the government and CBN. Id. More than 70 of the cement suppliers met with the negotiating committee, and at least 43 accepted the terms of a proposed settlement agreement, thereby releasing the government from its obligations under the cement contracts. See Defendants' Proposed Findings of Fact and Conclusions of Law ¶ 205 at p. 53. Plaintiffs in the present action were among the cement suppliers who declined to renegotiate their contracts.

*Individual Contracts*

Plaintiff Decor by Nikkei International, Inc. ("Nikkei") is a New York corporation. On April 21, 1975, it entered into a contract with the Federal Military Government of the Federal Republic of Nigeria ("Nigeria") under which it agreed to supply Nigeria with 240,000 metric tons of cement (B.S.S. 12/1958), plus or minus 10% at Nikkei's option. The purchase price was $60 per metric ton, C.I.F. Lagos/Apapa, for a total price of $14.4 million, plus or minus 10%. The cement was to be delivered in 6–ply Kraft paper bags (50 kgs G/N).

Upon the filing of a performance bond by Nikkei in the amount of $18,000 (one twenty–fourth of 3% of the total purchase price), which apparently had already been secured before the execution of the contract, Nigeria was in turn required to establish an irrevocable, transferable, divisible and confirmed letter of credit in favor of Nikkei for the total purchase price. The letter of credit was to be established through First National City Bank in New York City and was to be payable on sight upon presentation of invoices, clean on board bills of lading, and insurance certificates.

Pursuant to the contract, Nikkei was to commence shipment of cement to Nigeria within 45 days of its receipt of the letter of credit in New York. Delivery was to be made at the rate of 20,000 metric tons per

month, plus or minus 10% or plus such additional quantity as Nikkei elected to deliver. All shipments were to be insured by Nikkei out of Barcelona, Spain or Piraeus, Greece. Therefore, all shipments had to originate from those ports to be in conformance with the contract.[1]

The contract also provided that Nikkei would receive demurrage payments in an amount "not exceeding" $4,100 per diem, in the event that the cement could not be unloaded in Nigeria within a specified period of time provided that Nigeria was given due notice by cable of the departure from the port of loading of each consignment. Such demurrage was to be payable under the terms of the letter of credit, in addition to the full purchase price, upon presentation of time sheets and statements of facts duly certified as correct by the ship's master and by the ship's agent in Lagos, Nigeria.

The terms of the contract were to be governed by the laws of the United States, and all disputes arising thereunder were to be submitted to arbitration by the International Chamber of Commerce, Paris, France.[2]

On January 28, 1975, plaintiff East Europe Import Export, Inc. ("East Europe"), a New York corporation, entered into a cement contract with Nigeria. The terms of this contract were identical to those of the contract entered into by Nigeria and Nikkei except for the following: First, East Europe contracted to provide a fixed amount of bagged cement to Nigeria, 240,000 metric tons, without a 10% option. Second, the price of cement was to be $59.50 per metric ton, and East Europe was to provide Nigeria with a performance bond in the amount of 3% of the purchase price—$428,400. Third, Nigeria was to establish a letter of credit in favor of East Europe with First National City Bank in New York City. If East Europe determined that the letter of credit was not acceptable, it was to request appropriate amendments. If Nigeria refus-

ed to amend the letter of credit, the performance bond was to be returned to East Europe, and the contract was to be cancelled. Fourth, East Europe was to commence shipment of cement to Nigeria in amounts not less than 20,000 metric tons per month within six weeks of its receipt of Nigeria's letter of credit in New York. Fifth, the contract provided that East Europe was to insure each shipment from Constanza, Rumania, thereby requiring that all shipments originate from that port. Nigeria, upon request from East Europe, later amended the letter of credit to provide that shipments could be made from any port.

Plaintiff Chenax Majesty, Inc. ("Chenax"), a New York corporation, entered into a contract to supply Nigeria with cement on March 20, 1975. Its contract is similar to the contract entered into by Nikkei and Nigeria. The principal differences are that the Chenax contract required that Chenax provide Nigeria with cement conforming to Spanish specification P. 350; that Chenax was to provide Nigeria with a revolving performance bond in the amount of $36,000 (one–twelfth of 3% of the total purchase price of $14.4 million); that Nigeria's letter of credit was to be established in Chenax's favor with Schroeder, Muenchmeyer, Hengst & Co. in Hamburg, West Germany; that demurrage be accumulated at the unqualified rate of $4,100 per diem; and that the law of Switzerland was to govern the terms of the contract. Chenax's contract originally required that all shipments of cement be insured by Chenax from Barcelona and/or Tarragona, Spain to Lagos/Apapa Quay. Therefore, all shipments of cement were to originate from those ports. However, Nigeria later accepted Chenax's request that it be permitted to ship cement from other ports. It was agreed that shipment could be from any European or American port, and the terms of the letter of credit were amended accordingly.

---

1. Nikkei requested that it be permitted to ship cement out of other ports as well, but that request was never approved by Nigeria.

2. No arbitration of the claims asserted in these actions has been attempted, and defendants have waived any right to such arbitration.

## Letters of Credit

Contrary to the terms of these contracts, no letters of credit were ever established by Nigeria at any of the banks listed in the three cement contracts. Instead, Nigeria unilaterally established individual letters of credit in favor of each of the plaintiffs with defendant CBN and advised plaintiffs thereof through Morgan Guaranty Trust Company of New York ("Morgan"). These letters of credit could only be drawn upon at Morgan. Nikkei's letter of credit was issued by CBN on July 14, 1975, and Nikkei was advised of this through Morgan and First National City Bank in New York. East Europe's letter of credit was issued on August 4, 1975, and Morgan advised East Europe of that by letter dated August 13, 1975. Chenax's letter of credit was issued on April 25, 1975, and Chenax was notified by Morgan by letter dated May 8, 1975.

These letters of credit further deviated from the terms of the cement contracts since none of the letters of credit were confirmed by Morgan or any of the banks specified in the contracts. In spite of this nonconformity, each plaintiff accepted its respective letters of credit. CBN had indicated to Chenax and East Europe that it was "irrevocably" committed to honoring its engagements under the letters of credit. See letter dated July 14, 1975 from Bills Manager of CBN to East Europe and letter dated May 27, 1975 from CBN's Bills Manager to Chenax. Based on these representations, Chenax and East Europe accepted CBN's irrevocable letters of credit without confirmation.

Under these letters of credit, each plaintiff was to receive both the contract price of the cement and any demurrage for which Nigeria became liable under the contract. As indicated above, Nikkei and East Europe were entitled to receive demurrage in an amount *not exceeding* $4,100 per diem, while Chenax's contract provided that it would receive demurrage at the flat rate of $4,100 per diem. It appears the qualifying words "not exceeding" had been originally included in Chenax's contract but were intentionally stricken therefrom with the consent of Nigeria and Chenax.

Finally, the Court notes that each of the three letters of credit specifically stated that it would be subject to the Uniform Customs and Practice Documentary Credits (1962 Revision) as set forth in Brochure No. 222 issued by the International Chamber of Commerce.

## Nikkei's Performance Under the Contract

On July 29, 1975, Nikkei received notice that Nigeria had established a letter of credit in Nikkei's favor at Morgan in New York. Thereafter, on August 22, 1975, Nikkei authorized the transfer of part of its letter of credit, in the amount of $1,032,000, through Morgan to Transfina, N.V. of Curacao, Netherlands Antilles, from whom Nikkei had expected to purchase 20,000 metric tons of cement at a price of $51.60 per metric ton. The expiration date of the transfer was January 15, 1976. Transfina allegedly had sources of cement in the Caribbean. However, Nikkei's contract with Nigeria required that cement be shipped from and insured from either Barcelona, Spain or Piraeus, Greece. Since the contract was not modified to permit shipments out of the Caribbean,[3] Nikkei could not fulfill its contractual obligations through its subcontract with Transfina. On January 15, 1976, Nikkei's transfer of part of the letter of credit to Transfina lapsed pursuant to the terms of said transfer, and Nikkei reacquired its full interest in the letter of credit.

Thereafter, in August, 1975, Nikkei informally entered into an agreement with Productos Fontanet, S.A. of Palma de Malorca, Spain, under which Productos Fontanet was to provide Nikkei with cement for shipment to Nigeria. On August 28, 1975, Nikkei requested that Morgan transfer a portion of its letter of credit in the amount of $1.2 million to Productos Fontanet. Its written instructions to Morgan regarding this transfer directed that the partial transfer was to be made upon the same terms and conditions as the original letter of credit estab-

---

**3.** See Footnote 1 and accompanying text.

lished by Nigeria. The transfer was the means by which Productos Fontanet was to be paid for providing 20,000 metric tons of cement to Nigeria on behalf of Nikkei at the rate of $51 per metric ton. It appears that Productos Fontanet owned an interest in a cement factory. Also, Productos Fontanet had a wholly owned subsidiary which was a shipping company and which would provide the means of transporting the cement to Nigeria. Under this arrangement, Nikkei would have fulfilled its contractual obligations to Nigeria with respect to the first 20,000 metric tons of cement.

On or about August 29, 1975, Nikkei received a cable from Nigeria indicating that the Nigerian government had suspended the importation of cement for three months as of August 18, 1975 because of congestion at Lagos and other ports. Nikkei was directed to defer all further chartering and loading of ships. A "new agreement" was to be negotiated for the rescheduling of delivery of the balance of the cement.

Nikkei then cabled Productos Fontanet informing them of the cable from Nigeria and requesting that shipments be deferred for three months. Nikkei received a telegram on September 3, 1975 from Productos Fontanet indicating that a penalty would be assessed against Nikkei if shipments were delayed.

Thereafter, on September 11, 1975, Nikkei and Productos Fontanet entered into a written contract whereby Productos Fontanet agreed to provide Nikkei with 120,000 metric tons of BSS 12/1958 cement, plus or minus 10% at the option of Productos Fontanet. The contract further provided that Nikkei would have an option to purchase an additional 120,000 metric tons. It was agreed that the price of the cement would be $54 per metric ton for the first 8,500 metric tons and $52 for the balance. Shipment was to be made "C.I.F.F.P.A. from any Mediterranean and/or European port(s) to Lagos, Apapa." Payment was to be made by transfer of the irrevocable letter

of credit issued by CBN through Morgan. Also, Productos Fontanet was to receive demurrage not exceeding $4,100 per diem from Nikkei.

On September 12, 1975, bills of lading and other documents were issued by Productos Fontanet for a shipment of 8,500 tons of cement from Barcelona, Spain to Lagos/Apapa. These documents were presented to Morgan in New York on September 29, 1975, and Morgan paid $510,000 to Nikkei and Productos Fontanet. However, no ships ever sailed for Nigeria because clearances for shipment were never issued by Nigeria.

The day following this payment to Nikkei and Productos Fontanet or soon thereafter, Morgan in New York notified Nikkei by letter that the irrevocable letter of credit issued by Nigeria had been amended to provide that "[a]ll commercial invoices presented must be certified invoices and must be certified by the beneficiaries or their agents." CBN had also informed Morgan that it should not make payments for demurrage under any letter of credit which had been issued regarding any cement contract unless the documents submitted to Morgan were certified by CBN. CBN also required that Morgan not "pay against documents presented in respect of letters of credit . . . unless such documents are accompanied by certificates confirming that clearance [for shipping] has been obtained for the ships to sail to Nigeria." See letters dated September 30, 1975 from Morgan to Nikkei.[4] Nikkei had not agreed to the addition of these conditions for payment under the letter of credit.

On or about October 8, 1975, Nikkei's president and principal shareholder, Tetsuo Ozawa, traveled from New York City to Lagos, Nigeria to meet with the Cement Negotiating Committee of the Nigerian government at the Committee's request. The meeting took place at CBN's offices. The purpose of this visit was to discuss the rescheduling of cement deliveries. At that

4. Plaintiffs East Europe and Chenax also received notification from Morgan of the amendments to their letters of credit by CBN and of

the suspension of importation of cement into Nigeria.

meeting, Ozawa, as Nikkei's representative, was asked to cancel the cement contract and letter of credit without compensation. Ozawa declined. Ozawa again traveled to Nigeria in February, 1976 to meet with various government officials. He was again asked to discharge the contract and the letter of credit, and again he declined.

The evidence submitted at trial indicates that Nigeria did not intend to provide Nikkei or any of the other plaintiffs herein with the certificates they would need to obtain payment due from Morgan under the letters of credit as amended unless they agreed to cancel their cement contracts.

*East Europe's Performance Under its Contract*

Pursuant to the terms of its contract, East Europe was required to post a performance bond in the amount of $428,400. The contract expressly states that such a performance bond was "already deposited by [East Europe] with the Central Bank of Nigeria" as of the date of the execution of the contract–January 28, 1975. It appears, however, that no performance bond had yet been established as of that date. Indeed, East Europe did not provide Nigeria with a performance bond of any amount until July 25, 1975 when a bond was issued through First National City Bank in the amount of only $248,400. CBN issued a letter of credit in favor of East Europe on August 13, 1975, although a performance bond in the amount of $428,400 was never established by East Europe.[5]

However, the letter of credit established by Nigeria in favor of East Europe did not contain a requisite appendix which set forth the acceptable ports from which shipment of cement might originate, the demurrage rate, and other contract terms. Therefore, it was not acceptable to East Europe. On August 18, 1975, East Europe requested that amendments be made to the letter of credit which set forth these contract terms. By letter dated September 8, 1975, Morgan

in New York informed East Europe that these amendments had been made.

Because of these delays by East Europe in obtaining a performance bond and by CBN in issuing an amended letter of credit, a prior subcontract which East Europe had entered into with a Romanian cement supplier–Vitrocim–lapsed. East Europe had entered into this contract with Vitrocim on December 13, 1974 in anticipation of the Nigerian cement contract. Having lost its subcontractor, East Europe sought to find an alternate source of cement.

On September 24, 1975, East Europe entered into a subcontract with International Trade & Finance Espanola S.A. ("Intrafinsa") under which Intrafinsa would supply and deliver to Nigeria 120,000 metric tons of cement at a price of $51.25 per metric ton, CIF Lagos/Apapa. Payment of this subcontract was to be effected by a transfer of a portion of CBN's letter of credit in favor of East Europe to Intrafinsa. Also, Intrafinsa was to receive demurrage in an amount not exceeding $4,100 per diem.

By letter dated October 3, 1975, Morgan informed Intrafinsa that a transfer of a portion of CBN's letter of credit had been made. However, prior to that date, the Nigerian government had informed East Europe of the suspension of the importation of cement into Lagos and other Nigerian ports. Also, CBN further amended its letter of credit to require certification of all documents "by the beneficiaries or their agents" prior to presentment and payment under the letter of credit.[6] Morgan's letter to Intrafinsa regarding the partial transfer specifically noted these limitations.

Notwithstanding this amendment to the letter of credit by CBN and the suspension of importation of cement, East Europe apparently elected to perform its obligations under the cement contract rather than suspend its performance since it had not agreed to the amendment to the letter of credit and had not agreed to any modification of its contract.

---

**5.** Evidence of a second performance bond in the amount of $180,000 issued by Chase Manhattan Bank, Piraeus, Greece, on behalf of East Europe was submitted to the Court.

**6.** See Footnote 4 and accompanying text.

On or about October 14, 1975, Morgan was presented with documents which complied with the conditions set forth with the original letter of credit issued by CBN, but which did not bear certifications by the Nigerian Authorities. The documents indicated that 10,500 metric tons of cement had been loaded on the vessel M/V Torenia at Bilboa, Spain, and was destined for Lagos/Apapa. Upon inquiry by Morgan, CBN instructed Morgan not to make payment regarding this shipment under the letter of credit.

East Europe had also entered into another cement subcontract, for the purpose of fulfilling its obligation under the Nigerian cement contract, with Bergbau–Handel G.m.b.H. of Berlin, East Germany. That subcontract, dated April 11, 1975, provided that Bergbau–Handel would provide East Europe with 30,000 metric tons of cement, F.O.B. at the price of $27 per metric ton. Apparently, East Europe was required, under that subcontract, to obtain means of transporting the cement to Lagos/Apapa from Rostock, Germany. Payment under this subcontract was to be effected by a transfer of part of the CBN letter of credit. Pursuant to instructions from East Europe, Morgan notified Bergbau–Handel of the partial transfer. However, Bergbau–Handel rejected the transfer because the letter of credit did not comply with the terms of the subcontract.

On or about October 13, 1975, East Europe's principal officer, Irving Ross, traveled to Nigeria on behalf of East Europe pursuant to an invitation from the Nigerian authorities to discuss the problem of congestion in the ports of Nigeria and the suspension of importation of cement. Because there were a number of other cement contractors visiting Nigeria at that time, Ross became aware that Nigeria had contracted to purchase a substantial quantity of cement. He met with the Nigerian cement contract negotiating committee, as had Ozawa on behalf of Nikkei, and was told that Nigeria no longer needed or wanted cement. He was asked to cancel the cement contract, but he did not agree to the proposed cancellation. He later asked for clearances for shipment of cement pursuant to East Europe's cement contract. These requests were never granted.

*Chenax's Performance Under Its Contract*

Prior to entering into its contract with Nigeria, Chenax had entered into an *oral* agreement with Transcommerce Warenhandels Gmbh & Co. KG of Hamburg, Germany ("Transcommerce") whereby Transcommerce and Chenax agreed to "cooperate" in the fulfillment of Chenax's cement contract. Pursuant to that agreement and in anticipation of the execution of the Nigerian cement contract, a revolving performance bond in the amount of $36,000 was issued by Schroeder, Muenchmeyer, Hengst & Co. on behalf of Chenax and Transcommerce. Notice of the issuance of the bond was sent to CBN by letter dated March 14, 1975 by Schroeder, Muenchmeyer & Hengst Co. Nigeria subsequently established a letter of credit in favor of Chenax on April 25, 1975 with CBN.

On May 13, 1975, Chenax requested that Morgan transfer the entire letter of credit to Transcommerce, and Morgan complied with that request. However, on or about August 14, 1975, Schroeder, Muenchmeyer, Hengst & Co. notified Morgan that Transcommerce had rejected the transfer. Apparently, Transcommerce had determined that it would not participate in the performance of the cement contract. Chenax's principal officer, director and major shareholder, Dr. Uche Akuba, testified at trial that Chenax and Transcommerce had originally intended to obtain cement from Cementos Especiales, a cement factory in Las Palmas, Canary Islands. When Transcommerce decided to withdraw from this matter, Chenax obtained the services of an agent, Souhail Makareem. Makareem, according to Dr. Akuba's testimony at trial, obtained a separate oral arrangement with Cementos Especiales to supply Chenax with 40,000 metric tons of cement at $34.80 per ton, F.O.B. Las Palmas, with an option by Chenax to purchase the balance of its needs from Cementos Especiales at that price. The cost of insurance was to be $.35 per

metric ton. For his services as Chenax's agent, Makareem was to receive $.65 per metric ton for each metric ton of cement purchased by Chenax from Cementos Especiales.

Chenax's shipping agent, M. G. Pamies, procured a contract of affreightment with the shipping firm of Pearl Marin Shipping, Stockholm, Sweden, to carry 240,000 metric tons of cement in bags, plus or minus 10%, from Las Palmas to Nigeria at the rate of $16.60 F.I.O.S. Demurrage would be paid to Pearl Marin Shipping at the rate of $.40 per metric ton per day or pro rata for any part of a day. Pearl Marin was to pay brokerage fees of 4.5% of the freight and demurrage under that contract. Of this amount, M. G. Pamies was to receive 2.5%. It is unclear from the contract as to who was to receive the remaining 2%. Dr. Akuba testified at trial that he understood that Chenax would receive the remaining 2%. The Court finds that the evidence submitted does not support the conclusion that Chenax was entitled to the remaining 2% in brokerage fees.

Dr. Akuba also testified that either in early July, 1975 or in early August, 1975, he met with agents for an unspecified Italian cement company and had received an oral commitment from it to provide Chenax with cement at the rate of $32 per metric ton, F.O.B. Italian ports. The Court notes that this oral commitment was made either before or at about the time that Chenax entered into an oral agreement with Cementos Especiales to purchase 40,000 metric tons of cement at the price of $35 per metric ton.

On or about August 28, 1975, Chenax received a cable from the Nigerian government informing Chenax that the importation of cement was suspended for at least three months. Chenax thereafter expressly accepted the suspension. Morgan subsequently informed Chenax that CBN had amended its letter of credit; the proposed amendment was similar to those attempted to be made by CBN with respect to the letters of credit issued in favor of Nikkei and East Europe; it was also undertaken unilaterally.[7] Chenax did not consent to these amendments.

During October, 1975, Dr. Akuba visited Nigeria pursuant to an invitation to meet with representatives of Nigeria's Ministry of Defense and CBN. He was asked to cancel the Nigerian cement contract and CBN's letter of credit, but he refused to do so.

## Discussion—Jurisdiction

Before addressing the merits of plaintiffs' claims, the Court will first resolve defendants' contention that they are both immune from the jurisdiction of this Court pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*, under the circumstances set forth above. This defense of sovereign immunity was originally raised by defendants in their answer to the complaints, but it was stricken therefrom by Order of this Court dated June 16, 1979. Magistrate Schreiber, to whom motions regarding this issue had been referred to hear and recommend, previously reported that, in his view, this Court had jurisdiction over defendants pursuant to section 1605(a)(2) of the Act. See Magistrate Schreiber's Amended Recommendation dated September 19, 1978. This Court adopted that recommendation. By arguments raised in their post—trial submissions, defendants seek to renew their contention that this Court lacks in personam jurisdiction over them under the Act.

## The Foreign Sovereign Immunities Act of 1976

In adopting the Foreign Sovereign Immunities Act, Congress sought to accomplish four objectives: (1) to codify the "restrictive principle" of sovereign immunities, as it has been generally recognized in international law, under which a foreign state is immune from suits in the courts of another country which are founded upon its "public acts" (jure imperii), while acknowledging the jurisdiction of said courts regarding actions based on the commercial or "private acts" (jure gestionis) of the foreign state;

---

**7.** See Footnote 4 and accompanying test.

(2) to insure that this restrictive principle is applied in actions in the courts of the United States, thereby dispensing with the authority of the Department of State to make final determinations regarding foreign immunity; (3) to provide a statutory procedure for service of process and obtaining in personam jurisdiction over a foreign state; and (4) to provide a means by which a judgment creditor may secure a remedy if a foreign state fails to satisfy a final judgment. H.R.Rep.No.94–1487, 94th Cong., 2d Sess. 7–8, reprinted in [1976] U.S.Code Cong. & Ad.News, pp. 6605–606 (hereinafter cited as "House Report"). A principal purpose of the Act was to provide a remedy for American citizens, businessmen, and property owners who increasingly come into contact with foreign states and commercial entities owned by foreign states. *Verlinden B.V. v. Central Bank of Nigeria*, 488 F.Supp. 1284 at 1291 (S.D.N.Y., 1980).

Section 1604 of the Act expressly sets forth the grant of immunity afforded foreign sovereigns. It provides that except for the limitations enumerated in sections 1605 and 1607 thereof and subject to existing international agreements entered into by the United States at the time the Act became effective, "a foreign state shall be immune from the jurisdiction of the courts of the United States . . . ." 28 U.S.C. § 1604. The grant of immunity therefore is limited, and the Court must look to other provisions of the Act, particularly section 1605, to determine the bounds of the grant of immunity.

The subject matter and personal jurisdiction of this Court in civil actions involving foreign states is defined in section 1330 of Title 28, United States Code. It states:

"(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) [of the Foreign Sovereign Immunities Act] as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of [the Act] or under any applicable international agreement.

(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of [the Act.]"

This Court accordingly has subject matter jurisdiction pursuant to section 1330(a) over civil actions in which the defendant foreign state is not entitled to immunity under the Foreign Sovereign Immunities Act. Also, it has personal jurisdiction pursuant to section 1330(b) over a foreign state in actions in which the claim asserted by the plaintiff is "one over which the district courts have original jurisdiction under section 1330(a), meaning a claim for which the foreign state is not entitled to immunity." House Report at p. 6612. Therefore, the focal issue with respect to both the Court's subject matter and personal jurisdiction is whether the defendant foreign state is entitled to immunity under the alleged facts.

Section 1605(a) of the Foreign Sovereign Immunities Act sets forth several instances in which a foreign state will not be immune from the jurisdiction of American courts. In particular, section 1605(a)(2) describes three instances in which immunity will not be afforded the foreign state. These are: (1) when the action is based upon a commercial activity carried on within the United States by the foreign state; (2) when the action is based upon an act performed in this country which relates to a commercial activity of the foreign state elsewhere; and (3) when the action is based upon an "act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). The first two exceptions to the grant of immunity under this provision involve activities of the foreign state within the United States. The third exception involves the foreign activities of the foreign sovereign which cause some direct injury or result in the United States.

■ The "direct effect" requirement of the third exception under section 1605(a)(2)

is apparently intended, in part, to ensure that there is "some connection between the lawsuit and the United States" thereby assuring that the exercise of the court's personal jurisdiction over the foreign state under section 1330(b) comports with the minimum contacts standard set forth in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) and *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). House Report at p. 6612. Therefore, the "direct effect" exception under section 1605(a)(2) requires not only that there be an immediate causal effect within the United States, *Carey v. National Oil Corp.*, 592 F.2d 673, 676 (2d Cir. 1979), but also that there be sufficient minimum contacts between the matter in controversy and the United States to support the court's exercise of in personam jurisdiction.

■ The Court also notes that the third exception under section 1605(a)(2) was also intended to subject a foreign state to the jurisdiction of the courts of the United States with respect to the foreign state's commercial conduct elsewhere in a manner "consistent with principles set forth in section 18, Restatement of the Law, Second, Foreign Relations Law of the United States (1965)." House Report at p. 6618. Section 18 of the Restatement states:

> "A state has jurisdiction to prescribe a rule of law attaching legal consequences to conduct that occurs outside its territory and causes an effect within its territory, if either
>
> (a) the conduct and its effect are generally recognized as constituent elements of a crime or tort under the law of states that have reasonably developed legal systems, or
>
> (b)(i) the conduct and its effects are constituent elements of activity to which the rule applies; (ii) *the effect within the territory is substantial*; (iii) *it occurs as a direct and foreseeable result of the conduct outside the territory*; and (iv) the rule is not inconsistent with the principles of justice generally recognized by states that have rea-

sonably developed legal systems." (emphasis added).

Section 18(b) of the Restatement is similar in substance to the "direct effect" clause of section 1605(a)(2) of the Foreign Sovereign Immunities Act. Both section 18(b) of the Restatement and section 1605(a)(2) of the Foreign Sovereign Immunities Act provide for in personam jurisdiction over a defendant who has caused a direct effect within the forum state. Comment "f" following section 18 of the Restatement indicates that under subsection (b), "the effect within the territory must be *substantial* and occur as a direct and *foreseeable* result of the conduct outside the territory." Restatement (Second) Foreign Relations Law of the United States § 18 at p. 50 (1965). (emphasis added). Therefore, it appears that under the "direct effect" exception of section 1605(a)(2) of the Foreign Sovereign Immunities Act the determinative issues are whether the injury allegedly suffered by the plaintiff was a substantial, foreseeable, and immediate causal result of an act of the defendant outside the United States in connection with defendant's commercial activity elsewhere and whether the minimum contacts standard set forth in *International Shoe Co.* and *McGee* has been satisfied.

In the present actions, it is undisputed that each defendant would be immune from the personal jurisdiction of this Court pursuant to section 1604 of the Foreign Sovereign Immunities Act if none of the exceptions set forth in section 1605 applied. Defendant Nigeria is a foreign state, and defendant CBN, as an agency or instrumentality of defendant Nigeria, is also entitled to immunity. 28 U.S.C. §§ 1603(b), 1604. The questions presented to this Court by defendants' renewal of their contention that this Court lacks personal jurisdiction under sections 1330(b) and 1605(a)(2) of the Act are: (1) whether each defendant has committed an act outside the territory of the United States in connection with commercial activity elsewhere; (2) whether that act caused a substantial, foreseeable, and immediate effect in the United States;

and (3) whether the minimum contacts standard has been satisfied with respect to each defendant.

The acts of defendant Nigeria which plaintiffs allege constitute anticipatory breaches of their individual contracts took place outside the United States and relate to Nigeria's commercial transactions with plaintiffs. The suspension of the importation of cement and the refusal to issue documents to plaintiffs allowing them to commence shipment of cement into Nigeria took place in that country. Similarly, the conduct of defendant CBN which is in dispute relates to its commercial banking activities in Nigeria. The unilateral amendments of the three letters of credit occurred in Nigeria. *See Verlinden B.V. v. Central Bank of Nigeria, supra,* at 1298 ("the 'repudiation' was issued in Nigeria (an act outside the United States)"). Therefore, the requirement under the "direct effect" exception under section 1605(a)(2) that each defendant commit an act outside the United States in connection with their commercial activities elsewhere is satisfied. The remaining issues to be resolved are whether those acts had a substantial, foreseeable, and immediate causal effect within the United States and whether the minimum contact test has been satisfied.

*Judicial Interpretations of the Act*

The courts which have been presented with the issue of whether the "direct effect" exception renders a particular foreign state amenable to the jurisdiction of American courts have followed divergent modes of analysis. Some courts have held that the "locus of the injury is *dispositive* of jurisdiction" (emphasis supplied), implying thereby that both the minimum contacts standard and the requirement of a substantial, foreseeable, and immediate causal effect are satisfied when the locus of the injury is in the United States. *Verlinden B.V. v. Central Bank of Nigeria, supra,* at 1298 and cases cited therein. Other decisions have held that the "direct effect" exception is fulfilled "only where there are significant contacts between the transaction underlying the cause of action and the United

States." *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 78 Civ. 2395, slip op. at 12 (S.D.N.Y. July 16, 1980); *East Europe Domestic International Sales Corp. v. Terra,* 467 F.Supp. 383, 388 (S.D.N.Y. 1979). Each of these approaches addresses only one of the issues which must be resolved here. The locus–of–injury approach is primarily concerned with whether the alleged injury was a substantial, foreseeable, and immediate causal result of the act of the defendant foreign state. On the other hand, an analysis of the contacts between the underlying transaction and the forum country only addresses the issue of whether the minimum contacts standard has been satisfied.

While the determination of the locus of the alleged injury may indeed determine whether there has been a substantial, foreseeable, and immediate causal effect within the United States, it does not necessarily determine whether the minimum contacts standard has been met. A separate determination of this second issue must be made. *Cf. Carey v. National Oil Corp.,* 592 F.2d 673 (2d Cir. 1979).

■ In determining whether sufficient minimum contacts are present between the defendant foreign state and the United States, the court must consider not merely whether there are sufficient contacts with respect to the contract in dispute, but more broadly whether maintenance of the suit offends "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1940). The contacts between the defendant and the forum must be such that it is reasonable to require the defendant to litigate the dispute in that forum. *Id.* at 317, 66 S.Ct. at 158. The factors to be considered by the court are: (1) the burden placed on the defendant in litigating in that forum; (2) the interest of the forum in adjudicating the dispute, and (3) the plaintiff's interest in obtaining convenient and effective relief. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

■ In the present actions, the findings of fact of this Court as set forth herein support the conclusion that this Court has personal jurisdiction over each of the defendants under section 1330(b) and the "direct effect" exception of section 1605(a)(2) of the Foreign Sovereign Immunities Act. The alleged breaches of each of the three cement contracts and three letters of credit by the defendants caused substantial, foreseeable, and immediate injury to plaintiffs in New York. Each plaintiff is a New York corporation and payment was to be made to each plaintiff in New York through Morgan Guaranty Trust Company under the letters of credit. Similarly, the three cement contracts were effectively amended to provide for payment thereunder in New York by Nigeria's unilateral establishment of the letters of credit with CBN, all of which were payable in New York. Under these circumstances, the locus of injury was in New York. *Cf. Verlinden B.V. v. Central Bank of Nigeria, supra*, at 1298; *National American Corp. v. Federal Republic of Nigeria*, 448 F.Supp. 622, 639 (S.D.N.Y.1978), aff'd, 597 F.2d 314 (2d Cir. 1979). The necessary minimum contacts are also present. Again, payment under each of these contracts and under each letter of credit was to be made in New York. Although the cement which was to be delivered to Nigeria under the cement contracts did not originate in or pass through the United States, payment therefor was to occur in New York at the instance of defendant Nigeria. Since defendants chose New York as the place of payment, the burden of litigating in this forum should not be overly burdensome. Moreover, Congress has indicated that in enacting the Foreign Sovereign Immunities Act it intended to ensure that "our citizens will have access to the courts in order to resolve ordinary legal disputes." House Report at p. 6605. Finally, it is clear that the plaintiffs have a substantial interest in a convenient and effective resolution of their individual claims which they may not, under the circumstances, otherwise obtain elsewhere. In this Court's view, under the guidelines set forth in *World–Wide Volkswagen Corp. v. Wood-*

*son, supra*, there are sufficient minimum contacts to warrant the exercise of this Court's in personam jurisdiction over each of the defendants. *Contra, Texas Trading & Milling Corp. v. Federal Republic of Nigeria, supra.*

Having determined that this Court has in personam jurisdiction over the defendants, the Court will now address the merits of plaintiffs' claims.

*Merits of Plaintiffs' Claims*

The parties agree that the law of New York governs the claims asserted by Nikkei and East Europe for breach of contract and that the law of Switzerland is determinative of Chenax's claim for breach of contract. It is further agreed that with respect to the claims of all the plaintiffs for breach and repudiation of the individual letters of credit issued by CBN in favor of the plaintiffs, the Uniform Customs and Practice Documentary Credits (1962 Revision) governs. To the extent that the UCP does not indicate what relief may be obtained by a beneficiary of a letter of credit under the circumstances presented in this action, the parties agree that the law of New York governs the claims asserted by Nikkei and East Europe. Chenax contends that its claim under the letter of credit issued in its favor is also governed by New York law in this regard, but defendants contend that the law of Switzerland is determinative.

*Letters of Credit*

By the express terms of the individual letters of credit issued by CBN in favor of each of the plaintiffs, these letters of credit were irrevocable. Under Article 3 of the Uniform Customs and Practice for Documentary Credits, an irrevocable credit "can neither be modified nor cancelled without the agreement of all concerned." The UCP is silent, however, as to the remedies available to a beneficiary of a letter of credit where there has been a unilateral amendment of an irrevocable letter of credit by the issuer. Accordingly, this Court must review New York law to determine whether Nikkei and East Europe may recover dam-

ages for their claims regarding their individual letters of credit under New York law.

Under present New York law, a beneficiary of an irrevocable letter of credit may usually obtain relief for anticipatory repudiation of the credit pursuant to Article 5 of the New York Commercial Code. N.Y. U.C.C. § 5–115 (McKinney 1964). However, section 5–102(4) of the New York Uniform Commercial Code provides:

"Unless otherwise agreed, this Article 5 does not apply to a letter of credit . . . if by its terms or by agreement, course of dealings or usage of trade such letter of credit . . . is subject in whole or in part to the *Uniform Customs and Practice for Commercial Documentary Credits.* . . ." N.Y. U.C.C. § 5–102(4) (McKinney 1964).

The Court notes that this provision of the New York U.C.C. is not contained in the model Uniform Commercial Code as adopted by the American Law Institute and by the National Conference of Commissioners on Uniform State Law. Its enactment reflects the intent of the New York legislature to maintain the pre–Code conduct of international transactions in the State of New York and to preserve the effect of the Uniform Customs and Practice for Commercial Documentary Credits. N.Y. Commission Comment on section 5–102 at p. 650 (McKinney 1964); T. Quinn, *Uniform Commercial Code Commentary and Law Digest* ¶ 5–101 [A][4] at pp. 5–6 to 5–8 (1978).

■ Therefore, since the letters of credit issued by CBN in favor of Nikkei and East Europe expressly state that the UCP was to govern the terms thereof, Article 5 of the New York U.C.C. and the remedies contained therein do not apply to these actions. *Marine Midland Grace Trust Company of New York v. Banco Del Pais,* 261 F.Supp. 884, 886 n.1 (S.D.N.Y.1966). Nevertheless, plaintiffs are not without a remedy under New York law. A letter of credit is a contract between the beneficiary of the credit and the issuing bank wholly separate from the underlying sales contract. *Shanghai Commercial Bank, Ltd. v. Bank of Bos-*

*ton Int'l,* 53 App.Div.2d 830, 385 N.Y.S.2d 548 (1st Dep't 1976). It appears that these plaintiffs may seek relief for the anticipatory repudiation of the credits under applicable pre–Code state law. Cf. *United Bank Ltd. v. Cambridge Sporting Goods Corp.,* 41 N.Y.2d 254, 392 N.Y.S.2d 265 n.2, 360 N.E.2d 943 (1976). As indicated in the discussion that follows, under pre–Code law, a complainant who asserts a claim for anticipatory repudiation of a contract must demonstrate that he would have been ready, willing, and able to fulfill his obligations under the contract. *Scholle v. Cuban–Venezuelan Oil Voting Trust,* 285 F.2d 318 (2d Cir. 1960). Therefore, Nikkei and East Europe each have the burden of demonstrating that it would have been ready, willing, and able to tender the requisite documents to CBN. In effect, this requires that they each demonstrate that they would have been ready, willing, and able to perform the underlying cement contracts. This is the same burden plaintiffs bear with respect to their claims of anticipatory breach of the cement contracts, as discussed below. If plaintiffs prevail on their claims of anticipatory breach of the cement contracts, they shall also prevail on their claims of anticipatory repudiations of the letters of credit.

Chenax's letter of credit is silent as to what law governs its terms. It appears, however, that since Swiss law governs the terms of the underlying cement contract, it should also govern the terms of the letter of credit. Assuming arguendo that Chenax's letter of credit is governed by Swiss law rather than by New York law, the parties have nevertheless failed to definitively establish the applicable Swiss law. Therefore, this Court must assume that Swiss law regarding anticipatory repudiation of irrevocable letters of credit is the same as that of New York. *Ogden Development Corp. v. Federal Insurance Co.,* 508 F.2d 583 (2d Cir. 1974). Accordingly, Chenax must demonstrate that it would have been ready, willing, and able to perform its obligations under the letters of credit and produce the documents required for payment thereunder to prevail on its claim against CBN. Its ability to perform the underlying cement contract will be determinative of the issue.

*Anticipatory Breach of Contract–New York Law*

Under section 2–610 of the New York Uniform Commercial Code, N.Y. U.C.C. § 2–610 (McKinney 1964), when a buyer repudiates a contract with his seller with respect to a performance not yet due, the aggrieved seller may, *inter alia*, "resort to any remedy for breach provided in the Code." Defendants do not dispute that the suspension of the importation of cement and the failure to issue certificates to plaintiffs which authorized the commencement of shipping of cement into Nigeria pursuant to these contracts are sufficient to constitute anticipatory breaches of the three contracts under section 2–610. Indeed, these acts clearly demonstrate Nigeria's intent to terminate its performance under these contracts. Defendants contend, however, that plaintiffs must not only demonstrate that there was an anticipatory breach, but also that they were each ready, willing, and able to fulfill their individual obligations under the contracts.

■ Under New York law prior to the enactment of the U.C.C., a seller whose contract was anticipatorily breached was required to demonstrate that he would have been ready, willing, and able to complete performance under the contract. *Scholle v. Cuban–Venezuelan Oil Voting Trust, supra.* Although the express provisions of the Code, as adopted by New York, are ambiguous as to whether this requirement has been retained, the New York courts appear to have continued to require proof of readiness, willingness, and ability to perform. *E. g., UFITEC, S.A. v. Trade Bank & Trust Co.,* 21 App.Div.2d 187, 249 N.Y.S.2d 557 (1st Dep't 1964), *aff'd,* 16 N.Y.2d 698, 261 N.Y.S.2d 893, 209 N.E.2d 551 (1965); *see also, Tenavision, Inc. v. Neuman,* 45 N.Y.2d 145, 408 N.Y.S.2d 36, 379 N.E.2d 1166 (1978). Accordingly, this Court finds that plaintiffs Nikkei and East Europe individually have the burden of proving that they would have been ready, willing, and able to perform under the contracts in dispute.

The evidence submitted to the Court indicates that Nikkei had subcontracted with Productos Fontanet to obtain 120,000 metric tons of cement and that it had an option to purchase an additional 120,000 metric tons. Therefore, if Nikkei had exercised its option, it would have obtained its entire commitment under the cement contract with Nigeria from Productos Fontanet. As indicated by the bills of lading in evidence, it appears that Productos Fontanet was performing under its subcontract at the time importation of cement into Nigeria was suspended. N.Y. U.C.C. § 1–202 (McKinney 1964) (a bill of lading is prima facie evidence of the facts stated therein). Defendants have offered no credible evidence to the contrary.

Nikkei contends not only that it would have been able to fully perform under its cement contract through its subcontract with Productos Fontanet, but also that even if it had not exercised its option with Productos Fontanet, it would have been able to obtain an additional 144,000 metric tons of cement (the remaining 120,000 metric tons plus 10% of the 240,000 metric ton total under its contract with Nigeria) from other Spanish cement factories at a lower price than it was paying Productos Fontanet.

The evidence submitted at trial supports the conclusion that the cement factories in Spain and other European countries had sufficient un–utilized capacity in 1975 and 1976 to provide Nikkei, and the other plaintiffs, with sufficient cement to fulfill their contracts with Nigeria. In 1975, Spain produced more than 23.9 million metric tons of cement and had a capacity to produce more than 26.9 million metric tons of cement. *Memoria del Cemento* at p. 4. In 1976, Spanish cement factories produced more than 25.3 million metric tons of cement and had a capacity to produce more than 32.8 million metric tons of cement. *World Cement Directory 1977* at p. 246. Therefore, it appears that Spanish cement factories had sufficient capacity to produce more than 10 million additional metric tons of cement than was in fact produced during the period 1975 through 1976. In the aggregate, Nigeria's contracts with plain-

tiffs required the delivery of only 720,000 metric tons of cement.[8]

Therefore, since the evidence indicates that Productos Fontanet was performing its subcontract with Nikkei and that other factories in Spain had sufficient un–utilized capacity to provide Nikkei with enough cement to enable Nikkei to fulfill its obligations under its contract, the Court finds that Nikkei was ready, willing, and able to complete performance and provide Nigeria with 240,000 metric tons of cement. There is insufficient evidence to support Nikkei's contentions that it could have obtained a lower subcontract price than the price it had negotiated with Productos Fontanet or that it would have exercised its option to provide Nigeria with an additional 24,000 metric tons of cement. Therefore, Nikkei may not recover lost profits for the additional 24,000 metric tons of cement for which it had an option to supply Nigeria.

The Court also finds that East Europe could have provided Nigeria with 120,000 metric tons of cement through its subcontract with Intrafinsa. Intrafinsa had provided Nigeria with at least 37,630 tons of cement pursuant to Intrafinsa's subcontract with another cement supplier who is not a party to this action. *National American Corporation v. Federal Republic of Nigeria, supra.* Since sufficient cement was available in Spain and elsewhere in Europe in 1975 and 1976, see *World Cement Directory 1977,* it is reasonable to conclude that Intrafinsa could have fulfilled its obligations to East Europe under the subcontract, and East Europe, in turn, could have also fulfilled its contractual obligations to Nigeria.[9] Based on the evidence submitted at trial, it is apparent to the Court that East Europe

had in fact negotiated other purchases of cement during 1976 to fulfill its contractual obligations under other cement contracts with other parties. See Plaintiffs' Exhibits EE–25 and EE–26 regarding East Europe's purchase of 50,000 metric tons of cement from a Romanian source in April, 1976.

Defendants have sought to demonstrate that Irving Ross, East Europe's principal officer, had a questionable financial background and that East Europe could not, therefore, have been able to secure subcontracts to fulfill its obligations. However, since Nigeria had established an irrevocable, transferrable letter of credit in East Europe's favor with CBN, and in view of the availability of cement, it is clear that East Europe could have secured subcontracts for cement by transferring part of its letter of credit to such subcontractor, regardless of Ross' financial reputation in the industry. This in fact was the means by which East Europe was to effect payment under its subcontract with Intrafinsa.

*Anticipatory Breach of Contract–Swiss Law*

Since the cement contract between Nigeria and Chenax expressly states that the law of Switzerland should govern the terms of the contract, it is clear that Chenax's claim for breach of contract must be resolved under the laws of that country. Actions for anticipatory breach of a contract brought in Switzerland are governed by the Swiss Code of Obligations. Article 107 of that Code provides:

> "If the obligor is in default in the case of a bilateral contract, the obligee shall be entitled to fix an appropriate time limit . . . for subsequent performance, or

8. Defendants argue that none of the plaintiffs would have been able to fulfill its obligations if the Nigerian government had not suspended importation of cement into Lagos and had not renegotiated many of the outstanding cement contracts because the total volume of cement that Nigeria had contracted to purchase exceeded the amount of cement available during the relevant time period. This argument is meritless. Nigeria did suspend the importation of cement into Lagos and did renegotiate at least 43 of the cement contracts. Regardless of what may have occurred if no embargo had

been imposed, the issue before this Court is whether plaintiffs could have fulfilled their individual obligations under the circumstances that actually existed during the relevant time period.

9. It appears from the evidence submitted at trial that sufficient shipping resources were available to transport the cement to Nigeria, particularly since Nigeria had cancelled several of its cement contracts thereby increasing the number of ships available.

to have it fixed by the competent authority.

"If, at the expiration of this time limit, there is no performance, the obligee may still sue for performance plus damages due to delay . . . . Alternatively, if he so declares without delay, *he may waive future performance and ask for compensation for damages arising out of the nonperformance,* or he may withdraw from the contract." Swiss–American Chamber of Commerce, *Swiss Contract Law, English Translation of Selected Official Texts* ¶ 107 at p. 35 (1977) (emphasis supplied).

The parties do not dispute that Chenax has elected to waive future performance and to seek damages for anticipatory breach of contract as provided in Article 107. Defendants also do not dispute, and this Court expressly finds, that the acts complained of by Chenax constitute an anticipatory breach by defendants of the Chenax cement contract under Swiss law for the reasons set forth previously. See discussion regarding anticipatory breach of contract under New York law. Defendants do contend, however, that Chenax must prove that it was able to perform the contract and that it must prove damages as provided in the Swiss Code of Obligations. The Court notes that with respect to the issue of liability, defendants' expert witness testified during the trial of this action that "[i]t would be sufficient to prove that [Chenax] had the possibility to have [the cement] delivered." Trial Transcript at p. 1232. Chenax has not disputed this testimony. Therefore, it appears that under Swiss law, Chenax must prove that it could have performed its obligations under the

cement contract in dispute. This burden of proof is apparently equivalent to the burden of proof required under New York law in actions for anticipatory breach of contract.

The Court finds the evidence submitted at trial insufficient to support the conclusion that Chenax was ready, willing, and able to fulfill its contractual obligations. Chenax has failed to produce sufficient credible evidence which demonstrates that it had entered into a subcontract with Cementos Especiales under which Cementos Especiales was obligated to provide Chenax with the cement it required or that Cementos Especiales had the capacity to produce the requisite quantity of cement. None of the documents submitted at trial regarding the capacity and production of cement in Europe indicates the amount of unused capacity of Cementos Especiales to produce cement in 1975 and 1976. Furthermore, although Chenax contends that it could also have obtained 200,000 metric tons of cement from an Italian factory at a price which was lower than the price allegedly offered by Cementos Especiales, the evidence submitted in this regard is insufficient to support the allegation that such an offer was in fact extended to Chenax. The Court notes that Chenax's representative who testified at trial concerning this alleged offer, Dr. Akuba, could not identify the Italian cement factory involved. Accordingly, the Court finds that Chenax has failed to demonstrate that it was able to perform its obligations under the terms of the contract in controversy.[10]

*Demurrage*

 Each plaintiff has also claimed damages for lost profits on demurrage. They

---

**10.** The Court has already determined that sufficient cement was in fact available in Spain and other European countries during the period 1975–1976 to enable all three plaintiffs, including Chenax, to fulfill their contractual obligations to Nigeria. Nevertheless, the credible evidence does not demonstrate that Chenax intended to and was otherwise capable of performing under its contract. Whereas Nikkei and East Europe had obtained subcontracts with cement suppliers, Chenax has failed to demonstrate that it intended to and was able to provide Nigeria with cement or that it had

entered into a binding subcontract with a capable cement supplier. The only evidence which tends to support Chenax's contention that Chenax had an oral subcontract with Cementos Especiales is the hearsay evidence of Uche Akuba, Chenax's principal officer, director, and major shareholder. See Findings of Fact regarding Chenax's Performance Under Its Contract, supra. Having observed the demeanor of this witness and having reviewed the evidence submitted, this Court finds that Chenax has failed to demonstrate that it was ready, willing, and able to perform its contractual obligations.

each contend that their respective contracts were bargained for with an explicit expectation of profit on demurrage. However, since Nikkei's subcontract with Productos Fontanet provided that Productos Fontanet would receive demurrage not exceeding $4,100 per diem, the same demurrage rate provided in the underlying contract with Nigeria, it appears that Nikkei could not have obtained any profit from demurrage. Any demurrage which would have accrued would have been paid in total to Productos Fontanet rather than retained by Nikkei as profit.

Similarly, East Europe's subcontract with Intrafinsa provided that Intrafinsa would receive demurrage at a rate not exceeding $4,000 per diem. East Europe, therefore, could not have obtained a profit from demurrage for the same reason.

Moreover, even if these plaintiffs could have earned a profit because of a differential between the demurrage rates in their individual contracts with Nigeria and the demurrage rates in their respective subcontracts, estimating lost profits on demurrage for each of these plaintiffs could only be predicated upon unfounded speculation. If Nigeria had breached its cement contracts with all other suppliers except these plaintiffs and if all other suppliers accordingly ceased shipment of cement to Lagos immediately upon being notified, thereby relieving the port's congestion, plaintiffs would very likely have accumulated no demurrage. At the other extreme, if the congestion in the Nigerian ports continued indefinitely, plaintiffs could possibly have earned a significant amount of demurrage. Since estimation of demurrage herein involves unreasonable speculation, plaintiffs' claims regarding demurrage must be denied.

*Incidental Damages*

 East Europe and Nikkei seek to recover incidental damages incurred as a result of defendant Nigeria's breaches of their respective contracts. Nikkei contends that it incurred a total of $5,000 in expenses in sending Ozawa to Nigeria to meet with the Nigerian negotiating committee. East Europe seeks to obtain costs it incurred as a result of the trip taken by Ross to meet with the Nigerian negotiating committee. East Europe also seeks to recover attorney's fees it incurred in connection with its claims for breach of contract.

Section 2–708 of the New York Uniform Commercial Code provides that in addition to lost profits a seller may recover incidental damages incurred as a result of the anticipatory breach of the contract by the buyer. Included in such recoverable incidental damages are "commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach." N.Y.U.C.C. § 2–710 (McKinney 1964). The New York courts have given broad meaning to the phrase "reasonable charges, expenses or commissions" with the intent of putting the seller in as good a position as he would have been if performance would have been done. *Intermeat, Inc. v. American Poultry Inc.*, 575 F.2d 1017, 1024 (2d Cir. 1978). However, attorney's fees which were incurred as a result of or in connection with the prosecution of the seller's claim are not recoverable as incidental damages. *Neri v. Retail Marine Corp.*, 30 N.Y.2d 393, 334 N.Y.S.2d 165, 285 N.E.2d 311 (1972).

It appears that the expenses incurred by East Europe and Nikkei in sending their respective representatives to meet with the Nigerian negotiating committee in October, 1975 and in February, 1976 were incurred as a result of Nigeria's suspension of importation of cement, and its refusal to accept delivery of cement, and CBN's unilateral amendment of the letters of credit. Accordingly these expenses may be recovered by East Europe and Nikkei as incidental damages. East Europe's claims for attorney's fees must be denied.

*Punitive Damages and Interest*

 Finally, plaintiffs seek to recover punitive damages from Nigeria and CBN and to obtain interest under New York law. Under section 1–106 of the New York Uniform Commercial Code, "penal damages"

may not be awarded "except as specifically provided in [the Code] or by other rule of law." Plaintiffs contend that they are entitled to punitive damages since defendants maliciously breached their respective contracts. *Holodnak v. Avco Corp.*, 514 F.2d 285 (2d Cir. 1975), *cert. denied*, 423 U.S. 892, 96 S.Ct. 188, 46 L.Ed.2d 123 (1975). Even assuming that this Court may assess punitive damages for malicious breach of contract generally, plaintiffs have failed to demonstrate that defendants acted maliciously. Accordingly, the plaintiffs claims for punitive damages are dismissed.

 Interest on an award for breach of contract may be recovered under New York law, N.Y. C.P.L.R. § 5001(a) (McKinney 1963), and is to be computed "from the earliest ascertainable date the Cause of action existed," id. § 5001(b). Accordingly, this Court finds that Nikkei shall recover interest on its award of compensatory and incidental damages as of March 1, 1976, the median date of the twelve-month period during which Nikkei would have received payment for performance but for defendants' breach of contract. Similarly, East Europe shall recover interest on its award of damages as of April 1, 1976, the median date of the period during which it would have received payment.

*Conclusions*

 1. Nikkei shall recover compensatory damages from Nigeria for lost profits on the sale of 231,500 metric tons of cement. The measure of lost profit per metric ton shall be the difference between the contract purchase price of $60 per metric ton and the subcontract supply price set forth in Nikkei's subcontract with Productos Fontanet. Alternatively, Nikkei may recover such sum from defendant CBN for anticipatory repudiation of an irrevocable letter of credit.[11]

2. East Europe shall recover compensatory damages from Nigeria for lost profits on the sale of 240,000 metric tons of ce-

ment. Lost profits shall be assessed per metric ton at a rate equivalent to the difference between the contract purchase price of $59.50 and the subcontract supply price of $51.25 as set forth in its subcontract with Intrafinsa. Alternatively, East Europe, Nikkei may recover such sum from defendant CBN for anticipatory repudiation of an irrevocable letter of credit.

3. Chenax's claims for anticipatory breach of contract and anticipatory repudiation of the letter of credit are dismissed.

4. East Europe and Nikkei shall recover the expenses they each incurred in sending their representatives to meet with the Nigerian negotiating committee.

5. East Europe's claim for attorney's fees is denied.

6. Plaintiffs' claims for punitive damages are denied. Plaintiffs' claims for demurrage are dismissed.

7. Plaintiffs East Europe and Nikkei shall recover interest on their respective awards as provided herein.

Submit Judgments.

SO ORDERED.

---

11. Plaintiffs may not recover their lost profits twice, once under the cement contracts and again under the letters of credit. The letters of credit were merely the means by which plaintiffs were to be paid by Nigeria under the cement contracts.